T.C. Memo. 2013-11

UNITED STATES TAX COURT

E. BRUCE DIDONATO AND DENISE A. AGNESS DIDONATO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10801-09.                    Filed January 14, 2013.

<u>Robert John Alter</u>, for petitioners.

<u>Sze Wan Florence Char</u>, <u>Lydia A. Branche</u>, and <u>Marco Franco</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Respondent determined deficiencies in petitioners' 2003 and

2004 Federal income tax of $300,324 and $309,547, respectively, and accuracy-

**[\*2]** related penalties under section 6662(a) of $60,065 and $61,909, respectively.[1]

In an amended answer, respondent asserted a $69,278 increase to the 2003 deficiency as well as a $13,856 increase to the corresponding accuracy-related penalty. Both increases stem from a disallowed depreciation deduction for 2003 and recapture of excess depreciation deductions claimed for 1999 through 2002 for an undivided share in an aircraft that petitioner E. Bruce DiDonato (DiDonato) owned through a limited liability company. In DiDonato v. Commissioner, T.C. Memo. 2011-153, 101 T.C.M. (CCH) 1739 (2011), we held through partial summary adjudication that petitioners were not entitled to a $1,870,000 charitable contribution deduction for 2004 relating to the donation of a land conservation easement to Mercer County, New Jersey (Mercer County), because they did not obtain a contemporaneous written acknowledgment of the contribution as required by section 170(f)(8).[2]

---

[1]Unless otherwise indicated, section references are to the applicable version of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[2]More specifically, we held it was not possible for petitioners to obtain such an acknowledgment in 2004 because the contribution was conditional until at least December 2005, long after the 2004 year closed. See DiDonato v. Commissioner, T.C. Memo. 2011-153, 101 T.C.M. (CCH) 1739, 1743 (2011).

[*3]  Following petitioners' concession that they are not entitled to a dependency exemption deduction for DiDonato's father for 2003 and 2004 (subject years), we decide the following issues:[3]  (1) whether petitioners underreported by $52,397 the 2004 gross receipts of DiDonato's sole proprietorship optometry practice, Campus Eye Group (CEG).  We hold they did; (2) whether petitioners are entitled to depreciation expense deductions of $29,058 for 2003 and $7,005 for 2004 for a sport utility vehicle.  We hold they are not; (3) whether DiDonato's wholly owned S corporation, Campus Eye Group, ASC, Inc. (ASC), is entitled to deduct amounts claimed as employee achievement award expenses of $25,000 for 2003 and $21,501 for 2004.  We hold it is not;  (4) whether ASC may deduct expenses for conferences and meetings of $69,663 for 2003 and $59,117 for 2004.  We hold it may not; (5) whether DiDonato's wholly owned S corporation, Campus Eye Group ASC, Inc. (ASC), is entitled to deductions of $217,518 for 2003 and $262,745 for 2004 for the lease of a fractional interest in an aircraft.  We hold it is not; (6) whether petitioners are entitled to deduct rental expenses of $549,203 for 2003 and $477,501 for 2004 relating to two residential properties DiDonato owned.  We hold they may to the extent stated herein; (7) whether petitioners are

[3]We also deem the parties to agree, as respondent determined in the notice of deficiency, that petitioners are entitled to a $3,000 capital loss deduction and additional deductions for self-employment taxes due for each of the subject years.

[*4] entitled to deduct losses of $694 for 2003 and $19,994 for 2004 they claim were incurred in connection with a limited liability company's aircraft leasing activity.  We hold they may to the extent stated herein; (8) whether for 2003 petitioners must recapture excess depreciation claimed with respect to their aircraft leasing activity for 1999 through 2002.  We hold they must; and (9) whether petitioners are liable for accuracy-related penalties for substantial understatements of income tax.  We hold they are.[4]

FINDINGS OF FACT

I.    Preliminaries

Some facts were stipulated and are so found.  The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference.  Petitioners, husband and wife, resided in New Jersey when the petition was filed.  They have two children:  R.D. (age seven in 2003) and D.D. (age five in 2003).[5]

---

[4]Because we conclude there was a substantial understatement of income tax for each year at issue, we need not consider respondent's alternative positions that petitioners are liable for accuracy-related penalties due to negligence or disregard of rules or regulations or substantial valuation misstatement under sec. 6662(a) and (b)(1) and (3).  See sec. 1.6662-2(c), Income Tax Regs.

[5]The Court refers to minor children by their initials.  See Rule 27(a)(3).

[*5] II.     Petitioners

     A.     DiDonato

     DiDonato completed his undergraduate studies at Widener University, and he holds a doctorate in optometry from the Pennsylvania College of Optometry (now part of Salus University).  He interned at the National Naval Medical Center Hospital in Bethesda, Maryland.  During the years at issue DiDonato was a practicing optometrist, the owner and operator of an ambulatory surgical center, an investor in stocks and bonds, and the owner of various commercial and residential properties.  He frequented many social clubs during the subject years, including the Leash, the Philadelphia Club, and the Nassau Club.

     B.     Ms. DiDonato

     Petitioner Denise A. Agness DiDonato (Ms. DiDonato) attended St. John Fisher College in Rochester, New York (Rochester), and she graduated from the Pennsylvania College of Optometry with a doctorate in optometry.  During the years at issue Ms. DiDonato was a staff optometrist with CEG who oversaw billing and administration for that entity.  Ms. DiDonato was also the corporate

[*6] secretary for ASC.[6]  At all relevant times, Ms. DiDonato had family who resided in the greater Rochester area.

III.   The Prior Audit

DiDonato's (or petitioners') 1995 and 1996 Federal income tax returns, neither of which is at issue here, were selected for examination in or about 1997 (prior audit).  The Internal Revenue Service (IRS) audited those returns, and in particular, investigated whether DiDonato was a qualifying real estate professional entitled to deduct losses related to his rental real estate activities.  The IRS determined in the prior audit, the findings of which are not binding in the instant case, that DiDonato was a qualifying real estate professional during 1995 and 1996. The record does not establish the extent to which (if at all) DiDonato's real estate activities during the subject years paralleled his real estate activities in 1995 and 1996.

IV.   Overview of Petitioners' Activities Reported on the 2003 and 2004 Returns

Petitioners timely filed joint Federal income tax returns for 2003 (2003 return) and 2004 (2004 return).  Each of the 2003 and 2004 returns reported items

---

[6]Although testimony elicited at trial indicated that Ms. DiDonato was CEG's corporate secretary, we decline to conclude she was because CEG is not organized as a corporation.  Because Ms. DiDonato declined to appear at her own trial, we do not have the benefit of her testimony on this point.

[*7] of income and expense from CEG, ASC, Equipment Leasing, L.L.C.

(Equipment Leasing), and Mallard Property Management Group (Mallard).

V.    CEG and ASC

     A.    CEG

CEG is a multidisciplinary eye care practice that DiDonato has owned and

operated since September 1981.  CEG was organized as a sole proprietorship

during the subject years, though it was later organized as a limited liability company

of which DiDonato was the sole member.  For each of the subject years petitioners

reported CEG's income and expenses on Schedule C, Profit or Loss From

Business.

During the years at issue CEG used the services of approximately 30

optometrists, 20 independent contractors, and 50 staff employees.[7]  The

optometrists, independent contractors, and employees serviced patients in the areas

of neuroophthalmology, eye surgery, cornea service, ocular implants, optometry,

and medical management of eye disease, in addition to other services.

---

[7]An optometrist is a doctor of optometry specializing in the examination and diagnosis of eye diseases, visual conditions, and similar disorders.  By contrast, an ophthalmologist is a medical doctor specializing in eye and vision care trained to (in addition to other skills) perform eye surgeries.  While New Jersey recognizes optometry as a profession, N.J. Stat. Ann. sec. 45:12-1 (West 2009), optometrists are not necessarily permitted to practice medicine and perform surgeries, see id. sec. 45:12-9.7.

[*8] The optometrists who associated with CEG owned roughly 52 affiliated offices that used CEG's offices to see patients.

B.    ASC

ASC is an ambulatory surgical center that DiDonato incorporated in 1990. DiDonato is ASC's sole shareholder and president.  Since its inception, ASC has elected to be treated as a small business corporation (S corporation) for Federal income tax purposes and filed for each year at issue Form 1120S, U.S. Income Tax Return for an S Corporation.  DiDonato did not receive from ASC a regular biweekly salary, but he received from ASC a cash distribution at the end of each year.[8]  Petitioners reported DiDonato's distributive share of income and loss from ASC on Schedules E, Supplemental Income and Loss, attached to the 2003 and 2004 returns.

During the subject years, ASC had, in addition to its employees, between five and seven consulting ophthalmologists staffed as independent contractors.

---

[8]Respondent does not assert, and we do not decide, whether the distributions were compensation to DiDonato on which ASC owed employment taxes.  See, e.g., Joseph M. Gray Public Accountant, P.C. v. Commissioner, 119 T.C. 121, 129-130 (2002) (sole shareholder and president of an S corporation was a corporate employee for whom the corporation was liable to pay employment taxes under sec. 3121(d)(1)), aff'd, 93 Fed. Appx. 473 (3d Cir. 2004); see also David E. Watson, P.C. v. United States, 668 F.3d 1008 (8th Cir. 2012), cert. denied, ___U.S. ___, 133 S. Ct. 364 (2012).

[*9] Each ophthalmologist, a board certified medical doctor, was paid approximately $100,000 annually, supposedly for services he or she performed as a director of ASC.[9] Each doctor allegedly handled varying aspects of ASC's regulatory environment in exchange for the fee, purportedly for ensuring accreditation under the Accreditation Association for Ambulatory Health Care, managing risk, giving testimony at depositions, and overseeing the purchase of new equipment and implantable devices. The record does not establish the extent to which (if at all) the recipients actually performed these functions during the subject years or at any other time.

The ophthalmologists performed patients' surgeries at ASC's facilities. The ophthalmologists then billed their patients' third-party payors (i.e., insurance provider or Medicare) for services provided. At the same time, ASC billed the same third-party payor for facility services such as operating room usage, the labor, and implanted devices, in addition to other charges.

---

[9]One doctor who has the title of associate medical director received $48,000 per year for purportedly overseeing the purchase of new medical equipment and implantable devices. Although we may refer to one or more of the ophthalmologists as directors, we render no opinion as to whether he or she actually provided nonmedical services to ASC.

**[*10]** C.    Relationship Between CEG and ASC

CEG's and ASC's businesses were sizable; in the aggregate they handled roughly 30,000 patients during the subject years.  ASC's patients came to it in one of two ways.[10]  First, ASC's ophthalmologists received referrals through CEG.  Second, ASC's ophthalmologists performed surgeries for their patients at ASC's facility.

Trial testimony made clear that the line of demarcation between CEG's and ASC's practices was at times unclear.  CEG and ASC mostly (if not entirely) operated out of different suites within the same office complex.  In that regard, ASC paid to CEG for each subject year a facility fee for ASC's use of five office

---

[10]DiDonato expressed concern at trial over whether ASC's relationship with its medical directors (who doubled as surgeons) violated the Stark Act, 42 U.S.C. sec. 1395nn, and/or the Anti-Kickback Act, 42 U.S.C. sec. 1320a-7b.  In this regard, DiDonato testified that during the years at issue he sought out the advice of a law firm in Washington, D.C. (Washington), to review ASC's activities as they related to the Stark Act and the Anti-Kickback Act.  The Stark Act prohibits medical providers and hospitals from presenting claims to Federal healthcare programs where those claims are the result of referrals from physicians with whom the medical provider has a financial relationship.  See 42 U.S.C. sec. 1395nn(a) (2006).  The Anti-Kickback Act imposes criminal liability on anyone who, among other prohibited acts, knowingly and willingly solicits or receives any remuneration (including a kickback, bribe, or rebate) to induce an individual to make referrals for services that may be covered by a Federal health care program.  See 42 U.S.C. sec. 1320a-7b(a) and (b).  Because any potential violations of these laws are not at issue in this civil tax case, we do not address them here.  Nor do we address whether the physician "director" fees of $100,000 each annually were for services actually rendered.

[*11] suites. ASC claimed deductions for rents of $600,944 for 2003 and $668,092 for 2004. In addition, CEG paid, on behalf of ASC, payroll and payroll taxes of $204,650.13. Respondent allowed these payroll and payroll taxes as offsets to CEG's 2004 gross receipts.[11]

D.    DiDonato's Attempted Sale of ASC

During the subject years DiDonato investigated the possibility of a sale of a majority of his shares of ASC stock to a venture capital firm or a small cap investor.[12] In furtherance of such a stock sale, DiDonato engaged Michael Witter or his firm (among others) to find a suitable buyer. One potential buyer, a public company, had in or around 2003 offered to purchase a 51% stake in ASC for $33 million. DiDonato opted to not sell his shares of ASC stock during the subject years though at trial he testified that he intended to sell his shares of ASC stock for $105 million in the summer of 2013.

---

[11]Respondent reflected his allowance for payroll and payroll taxes paid by CEG for the benefit of ASC as an "adjusting entry" to CEG's gross receipts. The record does not explain why respondent allowed this offset.

[12]We decide that DiDonato intended to structure the sale of ASC as a stock sale and not an asset sale because, as he testified, he was offered $33 million for a 51% majority interest (i.e., stock interest) in ASC. The record does not suggest that DiDonato pursued the sale of ASC's assets at any time. We note that Barry Concool (sometimes, Dr. Concool) was a business associate of DiDonato who was involved, to an extent, in discussions regarding DiDonato's possible sale of ASC to the public company.

[*12] VI.    CEG's Controverted Income

    A.    Overview

Petitioners, relying on a trial balance printed at 2:20 p.m. on December 31, 2004 (2004 trial balance), reported gross receipts of $5,161,984 on CEG's 2004 Schedule C, Profit or Loss from Business.[13]  Respondent determined on audit of the 2004 return that CEG's gross receipts for that year should be increased to $5,214,381; i.e., an increase of $52,397.  We summarize now the relevant facts related to this adjustment.

    B.    CEG's Purchase of Surgical Supplies for Itself and ASC

During the subject years, CEG purchased surgical supplies for its use and that of ASC.  From January 1, 2004, through 2:20 p.m. on December 31, 2004, ASC "paid" $1,877,193 to CEG for the use of surgical supplies from January through November 2004.  At some point after 2:20 p.m. on December 31, 2004, ASC "paid" $65,364.23 to CEG for the use of surgical supplies during December 2004.  The $65,364.23 was not included in CEG's 2004 gross receipts.  The record is not clear whether amounts ASC paid for surgical supplies were actual transfers of cash by check or otherwise or whether the payments were simply bookkeeping entries adjusting intercompany obligations.

---

[13]CEG did not close for business until 5 p.m. on December 31, 2004.

**[*13]** C.     General Ledgers and Trial Balances

CEG and ASC at all relevant times employed a full-time in-house accountant to keep the companies' books and records.  During the years at issue, CEG used proprietary software programs from which an individual could generate general ledgers and trial balances and print hard copies thereof.  CEG coded accounts for "Contributed Capital--ASC" and "Contributed Capital" with account Nos. 4500 and 4700, respectively.  Both contributed capital accounts (i.e., account nos. 4500 and 4700) refer to payments from ASC to CEG for ASC's use of surgical supplies CEG purchased that were to be included when calculating CEG's gross receipts.  Respondent determined that all amounts credited to account nos. 4500 and 4700 should be included in CEG's gross receipts.  However, DiDonato testified at trial that a portion of those amounts ($65,364.23) was nontaxable capital contributions.

D.     Conflicting Trial Balances

The parties have stipulated three CEG trial balances for the 2004 year:  the 2004 trial balance, one dated August 21, 2006 (2006 trial balance), and the third dated November 14, 2011 (2011 trial balance).  As relevant here, the 2006 and 2011 trial balances each consistently included a credit (charge) to CEG's account No. 4700 for $65,364.23 relating to ASC's payment to CEG for the use of surgical

**[*14]** supplies.  The 2004 trial balance, on the other hand, omits entirely the

$65,364.23 capital contribution recorded under account No. 4700.

E.     Respondent's Determination of CEG's Gross Receipts

Respondent redetermined CEG's 2004 gross receipts on the basis of the 2006

or 2011 trial balance or both by making three adjustments.  Using CEG's patient

fees as a starting point, respondent first increased CEG's gross receipts by

$1,877,193 to reflect payments from ASC for the purchase of surgical supplies

through 2:20 p.m. on December 31, 2004.  Second, respondent increased CEG's

gross receipts by $65,364.23 to reflect payments from ASC for the purchase of

surgical supplies after 2:20 p.m. on December 31, 2004.  Third, respondent reduced

CEG's gross receipts by $204,650.13 to reflect payroll and payroll taxes CEG paid

for the benefit of ASC.  To summarize, respondent determined CEG's 2004 gross

receipts as follows:

| | |
|---|---|
| Patient fees | $3,476,473.98 |
| From ASC (surgical supplies) | 1,877,193.00 |
| From ASC (surgical supplies) | 65,364.23 |
| Adjusting entries (payroll and payroll taxes)[1] | (204,650.13) |
| Total | 5,214,381.08 |

[1]The adjusting entries relate to CEG's payment of payroll and payroll taxes
for the benefit of ASC.

[*15] VII.    CEG's Controverted Deductions

A.    Overview

Petitioners claimed depreciation expense deductions of $29,058 and $7,005 for a GMC Yukon Denali (Denali) on CEG's respective 2003 and 2004 Schedules C.  Respondent disallowed each of these deductions because, according to him, petitioners did not establish the vehicle was used in a trade or business.

B.    The Denali and CEG's Transportation Services

CEG and ASC, in addition to offering optometric and surgical services, also provided to patients transportation to and from the companies' facilities.  During the subject years, CEG employed between two and four full-time drivers and a few part-time drivers and sometimes called upon staff or a limousine company to drive patients as needed.  CEG and ASC owned multiple vehicles to transport patients, including two vans, one minivan, and the Denali (collectively, transport vehicles).  Each of the transport vehicles was kept at ASC's parking lot when not in use.  CEG at all relevant times maintained logs of its patients' appointments and denoted in the log whether a patient was transported from CEG during a particular visit by inserting a "T" on the comment line of the log.  The logs do not indicate which of CEG's vehicles was used to transport the patient, the patient's home address, the pickup or dropoff location, or the distance the patient was driven.

**[*16]** VIII.   ASC's Controverted Deductions

A.   Overview

Respondent disallowed various expenses ASC claimed as trade or business expense deductions on its Forms 1120S, including:  (1) "employee achievement" awards paid to Mr. Witter and DiDonato Builders/Developers, Inc. (DiDonato Builders), (2) expenses for conferences and meetings, and (3) lease payments to Equipment Leasing.

B.   Employee Achievement Awards

1.   DiDonato Builders

ASC had a relationship with DiDonato Builders, a general contractor business owned by DiDonato's cousin, Vincent DiDonato (Vincent).  On each of September 12 and October 10, 2003, DiDonato Builders invoiced ASC (and ASC paid to Vincent) $12,500 for a "bonus per agreement".  The parties have stipulated that neither petitioners nor ASC has a written agreement purporting to entitle DiDonato Builders to the $12,500 payments, and DiDonato testified at trial that the agreement was oral.

ASC claimed a $44,385 total deduction for employee achievement awards on its 2003 Form 1120S.  Respondent disallowed $25,000 of the $44,385 deduction for employee achievement awards paid to Vincent.

**[*17]**    2.    Firearm Purchase

ASC claimed a $37,501 deduction for employee achievement awards on its 2004 Form 1120S. Respondent disallowed $21,501 of the $37,501 deduction for a firearm DiDonato purchased in the United Kingdom for £11,250 ($21,501) on February 10, 2004. DiDonato gave the firearm to Mr. Witter in connection with investment advisory services related to the prospective sale of DiDonato's shares of ASC stock. The parties stipulated that the only document petitioners provided to substantiate ASC's entitlement to deduct the cost of the firearm was an American Express statement indicating that ASC paid for the firearm.

C.    Conferences and Meetings

ASC claimed expenses of $69,663 for 2003 and $59,117 for 2004 for conferences and meetings as other deductions on its Forms 1120S. More specifically, ASC claimed a staff meeting expense deduction for each of the following expenses for 2003:

| Item | Date | Payee | Amount |
|---|---|---|---|
| 1 | 1/10/03 | Covert & Moore | $840.00 |
| 2 | 1/27/03 | Grand Island Lodge | 1,361.25 |
| 3 | 1/27/03 | MBNA Bank | 3,382.92 |
| 4 | 2/28/03 | Davis & Boring | 11,234.20 |
| 5 | 3/1/03 | Good Old Days | 4,375.00 |
| 6 | 3/11/03 | The Leash | 601.06 |
| 7 | 5/4/03 | Musky | 657.50 |
| 8 | 3/9/03 | Amwell Valley Conservancy | 2,500.00 |

| | | | | |
|---|---|---|---|---:|
| 9 | 3/20/03 | Nassau Club | | 150.00 |
| 10 | 3/31/03 | MBNA Bank | | 752.28 |
| 11 | 5/4/03 | Musky[1] | | 657.50 |
| 12 | 4/24/03 | The Retail Company | | 2,605.00 |
| 13 | 5/23/03 | Musky | | 713.15 |
| 14 | 5/23/03 | Amwell Valley Conservancy | | 2,000.00 |
| 15 | 7/17/03 | The Leash | | 1,004.78 |
| 16 | 6/12/03 | The Leash | | 117.45 |
| 17 | 8/6/03 | Philadelphia Club | | 2,000.00 |
| 18 | 8/6/03 | The Leash | | 596.55 |
| 19 | 8/11/03 | River's Edge Restaurant | | 1,200.00 |
| 20 | 9/30/03 | The Leash | | 34.76 |
| 21 | 9/30/03 | Nassau Club | | 500.00 |
| 22 | 10/2/03 | DiDonato | | 2,767.37 |
| 23 | 10/10/03 | Grand Island Lodge | | 7,000.00 |
| 24 | 10/16/03 | The Leash | | 857.25 |
| 25 | 10/22/03 | River's Edge Restaurant | | 3,918.75 |
| 26 | 12/14/03 | Philadelphia Club | | 50.00 |
| 27 | 12/14/03 | Atlantic Indian | | 135.00 |
| 28 | 12/27/03 | River's Edge Restaurant | | 4,350.00 |
| 29 | 12/21/03 | Davis & Boring | | 10,000.00 |

[1]We note that items 7 and 11 are in the same amount, bear the same invoice number, and bear the same check number.

ASC also claimed staff meeting expense deductions for 2004 as follows:

| Item | Date | Payee | Amount |
|---|---|---|---:|
| 1 | 1/30/04 | Philadelphia Club | $2,501.87 |
| 2 | 1/30/04 | Grand Island Lodge | 1,590.24 |
| 3 | 2/28/04 | American Express | 1,806.34 |
| 4 | 3/02/04 | Davis & Boring | 13,198.30 |
| 5 | 3/18/04 | The Leash | 481.76 |
| 6 | 3/30/04 | Musky | 2,543.35 |
| 7 | 4/7/04 | Musky | 1,288.20 |
| 8 | 5/8/04 | Musky | 823.13 |
| 9 | 5/7/04 | The Leash | 107.00 |

| | | | |
|---|---|---|---|
| 10 | 6/24/04 | The Leash | 208.37 |
| 11 | 7/2/04 | Amwell Valley Conservancy | 2,000.00 |
| 12 | 7/12/04 | Nassau Club | 2,875.00 |
| 13 | 7/13/04 | The Leash | 1,642.41 |
| 14 | 7/23/04 | M&M | 1,032.50 |
| 15 | 9/15/04 | Philadelphia Club | 2,000.00 |
| 16 | 9/20/04 | Nassau Club | 50.00 |
| 17 | 10/4/04 | Nassau Club | 500.00 |
| 18 | 10/7/04 | Grand Island Lodge | 8,500.00 |
| 19 | 10/19/04 | Amwell Valley Conservancy | 50.00 |
| 20 | 11/6/04 | River's Edge Restaurant | 4,355.00 |
| 21 | 11/8/04 | Nassau Club | 775.00 |
| 22 | 11/19/04 | The Leash | 116.23 |
| 23 | 11/22/04 | Philadelphia Club | 329.60 |
| 24 | 11/27/04 | River's Edge Restaurant | 4,355.50 |
| 25 | 12/6/04 | Nassau Club | 50.00 |
| 26 | 12/6/04 | Atlantic Indian | 135.00 |
| 27 | 12/7/04 | Marsilio's | 318.00 |
| 28 | 12/20/04 | Philadelphia Club | 1,798.86 |
| 29 | 12/20/04 | Philadelphia Club | 100.00 |
| 30 | 12/23/04 | DiDonato | 2,810.50 |

Respondent disallowed in full each of the deductions for conferences and meetings. The parties have stipulated that the disallowed deductions relate to "purported meals and entertainment expenses for ASC's employees and staff." The parties also have stipulated that ASC provided to respondent copies of canceled checks and invoices from the establishments that provided the services deducted as the only documents to substantiate the expenses. Finally, the parties have stipulated ASC did not maintain logs recording the members of its staff who were present at the events or the business purpose of the expense, if any.

[*20] D.    Lease Payments

1.    Equipment Leasing

Equipment Leasing, L.L.C. (Equipment Leasing), is a New Jersey limited liability company that DiDonato formed in 1999 for purposes of holding a partial ownership interest (aircraft share) in a Cessna Citation V Ultra aircraft (aircraft). The aircraft is a jet with a crew of two pilots and can hold between seven and eight passengers.  DiDonato is Equipment Leasing's sole member, and petitioners reported his share of Equipment Leasing's income and expenses for the subject years on Schedules C attached to the 2003 and 2004 returns.

2.    ASC's Lease of the Aircraft

On August 3, 1999, Equipment Leasing entered into a purchase agreement with Executive Jet Sales, Inc., d.b.a. Net Jets (Net Jets), for a 6.25% undivided interest in the aircraft for $375,000.  Equipment Leasing in turn leased the aircraft share to ASC.  Equipment Leasing did not engage in any business activity other than leasing the aircraft share to ASC.

3.    ASC's Policy Regarding and Personal Use of the Aircraft

ASC had adopted a policy, which it did not follow, that the aircraft was to be used for business purposes only.  Under the terms of the policy, DiDonato had to authorize any use of the aircraft, and any time DiDonato or Ms. DiDonato was

[*21] on the plane, use of the aircraft was required to be authorized by one or more of ASC's other executives.  In practice, however, the aircraft was frequently used by petitioners and their children for personal reasons, or in connection with the sale of DiDonato's shares of ASC stock.  As to the personal use of this aircraft, one log for a flight in March 2003 (described more fully below) stated petitioners' video preferences as Barney and Thomas, ostensibly referring to the popular children's characters, Barney the dinosaur and Thomas the train.  The same flight log also stated petitioners' in-flight meal selection as chicken finger dinner to serve two children.  We infer that the children referred to on the flight log were petitioners' children.

On one occasion in 2004 ASC used the aircraft to transport one of its doctors, Harmon Stein (Dr. Stein), to his home in East Hampton, New York (East Hampton), on the Friday of the Labor Day holiday weekend, purportedly so Dr. Stein could perform surgeries on the same day at ASC's office in New Jersey (Dr. Stein had wanted to return to his home earlier that day).  In this regard, petitioners joined Dr. Stein on the outbound flight to East Hampton.  The return flight, which departed hours after the outbound flight landed, had petitioners as its sole passengers.  The lapse of time between when the outbound flight landed and the return flight departed, coupled with petitioners' presence on the return flight,

- 22 -

**[*22]** suggests that the aircraft was used to transport petitioners to Dr. Stein's East Hampton home. The record does not explain the business purpose, if any, for petitioners' joining Dr. Stein on the outbound portion of this trip.

4.    The Cost for Using the Aircraft Share

Equipment Leasing paid an upfront fee of $375,000 for the aircraft share, and it incurred a monthly management fee of an unspecified amount. In addition, Equipment Leasing incurred an hourly rate of $1,400 to $1,500 per hour the aircraft was in use (without a charge for deadhead time). DiDonato estimated the all-in cost of the aircraft (i.e., inclusive of financing costs, the management fee, and the hourly rate) to be approximately $4,000 per hour. While the cost for each of petitioners' flights during the years at issue is not clear from the record, a one-way flight on this aircraft from New Jersey to Washington cost around $3,000.

5.    Petitioners' Travels

Petitioners traveled to the following destinations on the aircraft on the following dates during 2003:

| Trip | Date | Origin | Destination | Miles | Passengers[1] |
|---|---|---|---|---|---|
| 1 | Thursday, 3/13/03 | Trenton, NJ | Orlando, FL | 897 | Petitioners & children |
| 1 | Tuesday, 3/18/03 | Orlando, FL | Homestead, FL | 210 | Petitioners & children |
| 1 | Tuesday, 3/18/03 | Homestead, FL | Trenton, NJ | 1,069 | Petitioners & children |
| 2 | Friday, 4/4/03 | Trenton, NJ | Key West, FL | 1,156 | Petitioners, Mr. Witter & 1 unknown individual |
| 2 | Tuesday, 4/8/03 | Key West, FL | Trenton, NJ | 1,156 | Petitioners, Mr. Witter & 1 unknown individual |

[*23] 3 Sunday, 4/27/03[2] Trenton, NJ Washington, DC 168 Petitioners, Dr. Holt & 1 unknown individual

| # | Date | From | To | Miles | Passengers |
|---|---|---|---|---|---|
| 3 | Sunday, 4/27/03 | Washington, DC | Trenton, NJ | 168 | Petitioners, Dr. Holt & 1 unknown individual |
| | Tuesday, 6/3/03 | Trenton, NJ | Miami, FL | 1,047 | DiDonato, Dr. Holt & another individual to discuss the sale of ASC |
| 4 | Tuesday, 6/10/03 | Miami, FL | Trenton, NJ | 1,047 | DiDonato, Dr. Holt & another individual to discuss the sale of ASC |
| 5 | Tuesday, 7/15/03 | Trenton, NJ | New London, CT | 162 | DiDonato & 2 or 3 individuals whose relationship to ASC is not clear from the record |
| 5 | Tuesday, 7/15/03 | New London, CT | Trenton, NJ | 162 | DiDonato & 4 individuals whose relationship to ASC is not clear from the record |
| 6 | Friday, 8/15/03 | Trenton, NJ | Rochester, NY | 246 | Ms. DiDonato & 2 unknown individuals |
| 6 | Sunday, 8/17/03 | Rochester, NY | Trenton, NJ | 246 | Ms. DiDonato & 2 unknown individuals |
| 7 | Thursday, 8/21/03 | Trenton, NJ | Ukiah, CA | 2,592 | DiDonato, Mr. Witter & 2 individuals whose relationship to ASC is not clear from the record |
| 7 | Tuesday, 8/26/03 | Ukiah, CA | Trenton, NJ | 2,592 | DiDonato, Mr. Witter & 2 individuals whose relationship to ASC is not clear from the record |
| 8 | Thursday, 9/18/03 | Trenton, NJ | Wichita, KS | 1,215 | DiDonato, Dr. Stein, 2 ASC doctors & 1 individual whose relationship to ASC is not clear from the record |
| 8 | Thursday, 9/18/03 | Wichita, KS | Las Vegas, NV | 998 | DiDonato, Dr. Stein, 2 ASC doctors & 1 individual whose relationship to ASC is not clear from the record |
| 8 | Sunday, 9/21/03 | Las Vegas, NV | Trenton, NJ | 2,200 | DiDonato, Dr. Stein, 2 ASC doctors & 1 individual whose relationship to ASC is not clear from the record |
| 9 | Monday, 10/13/03 | Trenton, NJ | Charlottesville, VA | 245 | DiDonato & 4 unknown individuals |
| 9 | Monday, 10/13/03 | Charlottesville, VA | Trenton, NJ | 245 | DiDonato & 4 unknown individuals |
| 10 | Tuesday, 11/4/03 | Trenton, NJ | Jacksonville, IL | 818 | DiDonato & Mr. Witter |
| 10 | Friday, 11/7/03 | Jacksonville, IL | Trenton, NJ | 818 | DiDonato & Mr. Witter |

[1]Our statement of the identity of the passengers on each flight is derived primarily from the Net Jets flight logs, as informed by DiDonato's testimony. Where we refer to a passenger as an "unknown individual", we do so because the record does not specify the person's name or relationship to petitioners.

[*24]    [2]DiDonato testified that the purpose of this Sunday trip to Washington was to meet with DiDonato's lawyers for an afternoon seminar on "health care issues."  Leo Holt (Dr. Holt) is not an employee or staff member of ASC, CEG, or DiDonato.  The flight log for this flight, as well as for the return flight, states that a fourth individual was on the aircraft, but that person is not identified in the record.

Petitioners traveled to the following destinations using the aircraft on the following dates in 2004:

| Trip | Date | Day | Origin | Destination | Miles | Passengers[1] |
|---|---|---|---|---|---|---|
| 1 | Tuesday, 2/17/04 | | Trenton, NJ | Atlanta, GA | 701 | Petitioners |
| 1 | Friday, 2/20/04 | | Atlanta, GA | Trenton, NJ | 701 | Petitioners |
| 2 | Friday, 2/27/04 | | Trenton, NJ | Columbus, MS | 895 | DiDonato & Mr. Witter |
| 2 | Sunday, 2/29/04 | | Columbus, MS | Trenton, NJ | 895 | DiDonato & Mr. Witter |
| 3 | Wednesday, 3/24/04 | | Trenton, NJ | Nassau, Bahamas | 1,061 | Petitioners & children |
| 3 | Sunday, 3/28/04 | | Nassau, Bahamas | Trenton, NJ | 1,208 | Petitioners & children |
| 4 | Wednesday, 4/7/04 | | Trenton, NJ | Rochester, NY | 246 | Ms. DiDonato & children |
| 4 | Saturday, 4/10/04 | | Rochester, NY | Trenton, NJ | 246 | Ms. DiDonato & children |
| 5 | Thursday, 4/8/04 | | Trenton, NJ | Washington, DC | 168 | DiDonato & 1 unknown individual |
| 5 | Thursday, 4/8/04 | | Washington, DC | Trenton, NJ | 168 | DiDonato & 1 unknown individual |
| 6 | Thursday, 5/20/04 | | Trenton, NJ | Washington, DC | 168 | DiDonato & 4 individuals whose relationship to ASC is not clear from the record |
| 6 | Thursday, 5/20/04 | | Washington, DC | Trenton, NJ | 168 | DiDonato & 4 individuals whose relationship to ASC is not clear from the record |
| 7 | Thursday, 5/27/04 | | Trenton, NJ | Key West, FL | 1,206 | DiDonato & Mr. Witter |
| 7 | Sunday, 5/30/04 | | Key West, FL | Trenton, NJ | 1,156 | DiDonato & Mr. Witter |
| 8 | Thursday, 8/12/04 | | Trenton, NJ | Saratoga Springs, NY | 198 | DiDonato & 2 individuals whose relationship to ASC is not clear from the record |
| 8 | Saturday, 8/14/04 | | Saratoga Springs, NY | Trenton, NJ | 198 | DiDonato & 2 individuals whose relationship to ASC is not clear from the record |
| 9 | Thursday, 8/26/04 | | Trenton, NJ | Washington, DC | 168 | Petitioners & children |
| 9 | Saturday, 8/28/04 | | Washington, DC | Trenton, NJ | 168 | Petitioners & children |
| 10 | Friday, 9/3/04[2] | | Trenton, NJ | East Hampton, NY | 143 | Petitioners & Dr. Stein |
| 10 | Friday, 9/3/04 | | East Hampton, NY | Trenton, NJ | 143 | Petitioners |

| | | | | | |
|---|---|---|---|---|---|
| 11 | Wednesday, 9/8/04 | Trenton, NJ | Las Vegas, NV | 2,200 | DiDonato, at least 2 ASC doctors, and as many as 3 individuals whose relationship to ASC is not clear from the record |
| 11 | Saturday, 9/11/04 | Las Vegas, NV | Trenton, NJ | 2,200 | DiDonato, at least 2 ASC doctors, and as many as 3 individuals whose relationship to ASC is not clear from the record |
| 12 | Thursday, 10/7/04 | Trenton, NJ | Rochester, NY | 246 | Ms. DiDonato & children |
| 12 | Monday, 10/11/04 | Rochester, NY | Trenton, NJ | 246 | Ms. DiDonato & children |

[1]Our statement of the identity of the passengers on each flight is derived primarily from the Net Jets flight logs, as informed by DiDonato's testimony.

[2]This trip occurred over the Labor Day holiday weekend.

### 6. Flight Logs and Manifests

Net Jets provided to Equipment Leasing flight logs for the use of the aircraft during the subject years. The parties have stipulated that the only written records maintained by ASC, the lessee, to substantiate the business purpose for the use of the aircraft during the subject years were Net Jets travel logs and invoices, and copies of brochures and registration materials of various eye care conferences.

The travel logs specified the date, origin and destination of the flights, flight distance, and flight and travel time and included a passenger manifest listing the number and names of passengers on the flight, as well as any onflight services and postflight transportation arrangements. However, some passenger manifests

**[*26]** included discrepancies between the number of passengers on the flight and the listed names.[14]

7.  Federal Income Tax Reporting of the Aircraft Share and
    Respondent's Proposed Adjustments

a.  Equipment Leasing

Petitioners claimed accelerated depreciation expense deductions totaling $278,950 on Equipment Leasing's 1999 through 2002 Schedules C.  In addition, petitioners reported losses from Equipment Leasing for the years at issue as follows:

| Item | 2003 | 2004 |
|------|------|------|
| Gross receipts | $217,518 | $262,745 |
| Less: | | |
| Other expenses | 91,582 | 177,039 |
| Repairs and maintenance | 64,320 | 67,872 |
| Depreciation | 43,200 | 21,600 |
| Interest expense | 19,110 | 16,228 |
| Income (loss) | (694) | (19,994) |

[14]For example, the travel log for the trip to Orlando, Florida (Orlando), from March 13 through 18, 2003 (Orlando flight), stated that four passengers were on the plane, yet the manifests listed petitioners as the only passengers on the flight.  At trial, following question from the Court on the point, DiDonato acknowledged that his children were on the Orlando flight.  As another example, the passenger manifests for the trip to Rochester, New York (Rochester trip), stated that three passengers were on the plane, yet Ms. DiDonato was the only passenger listed.

[*27] Respondent disallowed the loss deductions in full because, as he determined in the notice of deficiency, petitioners had not established that such expenses were incurred, paid, or ordinary and necessary business expenses of Equipment Leasing. Alternatively, respondent determined that the loss deductions were not allowed because Equipment Leasing had not established that its leasing activity was a bona fide business venture entered into for profit or that the substantiation requirements of section 274 had been met.

### b. ASC

ASC, the lessee of the aircraft share, claimed equipment leasing expense deductions on its Forms 1120S of $217,518 for 2003 and $262,745 for 2004. Under the alternative depreciation system of section 168(g), the aircraft share was depreciable under the straight-line method with a recovery period of 12 years. Respondent disallowed ASC's claimed equipment leasing expense deductions in their entirety and increased petitioners' distributive share of income from ASC accordingly.

## IX. The Personal Residence and Mallard's Real Estate Activities

### A. Overview

DiDonato's real estate activities, with the exception of his ownership of his personal residence and two office suites he owned through CEG, operated under

[*28] the Mallard trade name.[15] DiDonato, individually or through Mallard, owned various properties in New Jersey during the subject years. First, he owned his personal residence at 273 Cold Soil Road (personal residence), approximately 89 acres in size. Second, he owned two other residential rental properties on Cold Soil Road: 245 Cold Soil Road (245 Cold Soil property), and 265 Cold Soil Road property (265 Cold Soil property).[16] The acreage of the personal residence and the 245 and 265 Cold Soil properties, as DiDonato testified at trial, totals roughly 250 acres. The 245 and 265 Cold Soil properties are each adjacent to the personal residence; and according to a map included with the record, the personal residence was situated between the 245 and 265 Cold Soil properties. Third, he owned seven suites in an office building in Hamilton, New Jersey (Hamilton), as well as two additional commercial rental properties.[17] During the subject years, petitioners reported the income and expenses of nine real estate properties on

---

[15]The record is not clear whether Mallard was a separate company or simply a trade name through which DiDonato operated his rental real estate activities. Nor does the record include documentary evidence indicating that Mallard owned legal title to the properties in question. The parties stipulated, and we so find, that petitioners used the Mallard trade name to manage many of DiDonato's rental properties.

[16]The total acreage of these properties is not clear from the record.

[17]Five of the suites operated under the Mallard trade name and two of the suites were apparently owned by CEG.

[*29] Schedules E attached to the 2003 and 2004 returns; namely, the 245 and 265 Cold Soil properties, fives suites in the Hamilton office building, and as explained below, the two additional commercial rental properties. With the exception of the 245 and 265 Cold Soil properties and one of the office suites, DiDonato leased to ASC the rental properties reported on Schedules E attached to the 2003 and 2004 returns.

B.        Mallard's Books and Records

Mallard maintained books and records for the subject years.  The books and records omitted rental income purportedly received for the 245 and 265 Cold Soil properties.  At the same time, the books and records reported rental income from each of the nine other properties Mallard purportedly managed.  Notwithstanding the fact that Mallard's books and records do not show it received rental income from the 245 and 265 Cold Soil properties, petitioners reported annual rental income of $9,600 from each of the 245 and 265 Cold Soil properties.  The parties have stipulated petitioners do not have copies of any canceled checks showing they received payments of rent for either the 245 Cold Soil property or the 265 Cold Soil property during either of the subject years.

[*30] C.     The Personal Residence

Beginning in August 1997 and continuing through at least December 2001, DiDonato was granted several construction permits for his personal residence. Specifically, DiDonato received permission to build a 28,948-square-foot single-family residence with 5 bedrooms, 11 bathrooms, 4 fireplaces, a 4-car garage, a heated driveway and/or walkway, and an inground pool measuring 28 by 80 feet as well as other improvements.[18]  DiDonato Builders was named on the permits as the contractor for the personal residence.  During the time of the examination of the 2003 and 2004 returns, in or around early 2006, the personal residence had a large, power-operated gate with security cameras and stone-lined driveway.

D.     245 and 265 Cold Soil Properties

1.   Overview

DiDonato, recognizing the opportunity to develop the lots adjacent to the personal residence, acquired the 245 and 265 Cold Soil properties during the early-to-mid-1990s.  The record is not clear as to whether these properties are titled in the name of DiDonato or in the name of Mallard.  Petitioners conducted

---

[18]The square footage of the personal residence was initially set at 16,652, though permits included in the record proposed to increase it to 28,948 feet.  We understand a permit for installation of a snow-melting system at the personal residence to mean a heated driveway and/or walkway.

**[\*31]** "farming activities" on the 245 and 265 Cold Soil properties, allegedly

including the buying and selling of colts, pheasants, and cows.[19]  As DiDonato

testified at  trial, the "farming activities" were carried on to maintain the farm

designation on the properties and "to save money on [his] property taxes."  For the

most part, if not entirely, petitioners deducted the expenses related to their "farm"

operation as repair and maintenance expenses related to the 245 and 265 Cold Soil

properties.  DiDonato paid the property taxes on the 245 and 265 Cold Soil

properties, and he included in the payments on those properties a portion of the real

estate taxes due on the personal residence not immediately clear from the record.

### 2.    Sale of Development Rights

DiDonato sold property rights in the personal residence and the 265 Cold Soil

property during 1997 and 1998.  In 1997 he sold to Lawrence Township for

$50,182 development rights on a portion of the 265 Cold Soil property by which he

agreed to preserve a portion of the property as farmland; i.e., to not develop the

property for residential purposes.  In 1998 DiDonato sold to Mercer County for

---

[19]We refer to petitioners' "farming activities" as "allegedly" conducted
because petitioners did not report any farming income on the 2003 and 2004 returns.
Nor is the record clear whether the alleged "farming activities" were performed by
DiDonato,

[*32] $822,003 development rights on portions of his personal residence and the 265 Cold Soil property by which he agreed to restrict his use of those properties. We note that DiDonato also transferred to Mercer County, New Jersey, development rights on the 245 Cold Soil property discussed more fully in our prior opinion in this case. See DiDonato v. Commissioner, 101 T.C.M. (CCH) at 1739-1741.

3. Rental Agreements[20]

The evidence includes a rental agreement reciting that DiDonato leased to his father for $800 per month "the dwelling" located at the 265 Cold Soil property during the years at issue. Included in this rent were utilities at an average monthly cost of $400. The 2003 and 2004 returns each responded "No" to a question on Schedules E asking whether a member of petitioners' family used any properties reported on that schedule for personal purposes for the greater of 14 days or 10% of the total days rented at fair market value. DiDonato testified that he answered the question this way because he did not consider his father a member of his family.

_____

[20]We render no opinion as to whether either rental agreement discussed in this section was entered into at arm's length.

**[*33]** The evidence also includes a rental agreement reciting that DiDonato leased to Matthew Richen, whose relationship to DiDonato is not clear, for $800 per month "the dwelling" located at the 245 Cold Soil property. Like the rental for the 265 Cold Soil property, the rent included utilities at an average monthly cost of $400. During 2003 and 2004, when the dwelling houses of the 245 and 265 Cold Soil properties were respectively leased to DiDonato's father and Mr. Richen, DiDonato made major improvements to the land surrounding the dwelling houses.

4.  Improvements to the 265 Cold Soil Property

Respondent's revenue agent examined the 2003 and 2004 returns in March 2005. At or around that time, on two occasions, the revenue agent toured the personal residence, the 245 Cold Soil property, and the 265 Cold Soil property. The tours allowed the revenue agent to learn that the single-family residence associated with the 265 Cold Soil property had not been substantially improved despite DiDonato's contrary representation. Substantial improvements had been made, however, to the barn and land of the 265 Cold Soil property, including the building of ditches, swales, and bridges.

As will shown to be relevant, the revenue agent observed that the driveway to the 265 Cold Soil property was not protected by a gate and that the 245 Cold Soil property had a dirt gravel road for a driveway with no structures placed

[*34] thereon. The 265 Cold Soil property contained a single-family residence, a large barn, a small barnlike structure, several smaller structures, and a chicken coop. The large barn had several horses in it and one of the other structures contained machinery. The 245 Cold Soil property contained a single-family residence, a barn, a chicken coop, and a structure that was being used as a hunting lodge. There was a double line of trees running across the entire length of the personal residence and the 245 and 265 Cold Soil properties.

### 5. Purported Rental Expenses

Petitioners submitted thousands of pages of receipts, purchase orders, and invoices, purporting to substantiate expenses Mallard allegedly incurred in respect of DiDonato's rental properties. Some expenses were claimed to be exempt from New Jersey sales tax because Mallard had completed a Form ST-7, Farmer's Exemption Certificate.[21] Other purchase orders explicitly referenced that the work to be performed was to be completed at the personal residence; namely, electrical

---

[21]N.J. Stat. Ann. sec. 54:32B-8.16 (West 2002) provides: "Receipts from sales of tangible personal property and production and conservation services to a farmer for use and consumption directly and primarily in the production, handling, and preservation for sale of agricultural or horticultural commodities at the farming enterprise of that farmer are exempt from the tax imposed under the 'Sales and Use Tax Act.'"

[*35] work, installation of a security gate, the rental of dumpsters, and equipment for the construction of a swale (i.e., a wetland).[22]

Included among the expenses claimed by petitioners as deductions for repairs and maintenance of the 245 and 265 Cold Soil properties (or both) were the following: $2,300 for a room at the Carlyle Hotel in New York, New York, over the New Year's Day holiday; $374 to a toy store on December 15, 2003; a barbecue grill; a scarecrow motion-activated sprinkler; a security system; a lightning protection system; a farm gate; pool paint; dog food; fish food; toilet paper; 44 poinsettias; 75 strands of garland; ice scrapers; a salt lick for "Lucky"; equine shampoo; alfalfa cubes; cracked corn; chicken feed; clover seed; 136 bales of hay; hundreds of spruce, fir, and pine trees; flowers; grass seed; 42 live plant stalks of corn; 110 live pumpkin plants; poultry wire; and 3 signs stating a waterway was a "Private Streamway", in addition to many others. Suffice it to say, some expenses were personal, others concerned the status of the 245 and 265 Cold Soil properties as farms, and many bore no apparent relationship to the rental of the dwelling houses of the 245 and 265 Cold Soil properties.

---

[22]While the individual who delivered the dumpster and equipment for the swale listed the address to which the work related as the personal residence, DiDonato Builders referenced the property to which the expenses related as being for DiDonato generally at "Cold Soil Road".

[*36]         6.   Expenses Reported on the 2003 and 2004 Returns

The parties stipulated Mallard's books and records included all of the purported expenses of the 245 and 265 Cold Soil properties which petitioners claimed as deductions on the 2003 and 2004 returns. Mallard's books and records do not, however, show that Mallard received any rental income with respect to either the 245 Cold Soil property or the 265 Cold Soil property.

Petitioners claimed the following income and expense items on Schedule E of their 2003 Form 1040:

| Item | 245 Cold Soil Property | 265 Cold Soil Property |
|---|---|---|
| Income | | |
| Rental income | $9,600 | $9,600 |
| Expenses | | |
| Advertising | 148 | -0- |
| Insurance | 3,703 | 3,703 |
| Legal | 6,689 | 3,765 |
| Mortgage interest | 93,199 | 46,912 |
| Repairs | 95,944 | 161,324 |
| Taxes | 5,590 | 50,090 |
| Utilities | 2,898 | 4,836 |
| Other | 17,158 | 17,670 |
| Depreciation | 18,886 | 16,688 |
| Net loss | 234,615 | 295,388 |

Petitioners claimed the following income and expense items on Schedule E of their 2004 Form 1040:

| [*37] Item | 245 Cold Soil Property | 265 Cold Soil Property |
|---|---|---|
| Income | | |
| Rental income | $9,600 | $9,600 |
| Expenses | | |
| Advertising | -0- | 50 |
| Insurance | 4,237 | 6,024 |
| Legal | -0- | 5,357 |
| Mortgage interest | 82,171 | 45,945 |
| Repairs | 105,200 | 48,925 |
| Taxes | 5,853 | 51,081 |
| Utilities | 3,414 | 3,056 |
| Other | 20,698 | 7,176 |
| Depreciation | 26,641 | 61,683 |
| Net loss | 238,614 | 219,697 |

E.  Commercial Rental Properties

Respondent did not determine adjustments with respect to DiDonato's (or Mallard's) commercial rental properties, though we summarize the related rental activities for completeness and clarity.

DiDonato owned seven office suites in an office building in Hamilton, referred to as A-1, A-2, A-3, A-4, A-5, B-1, and B-2 (collectively, Hamilton office complex). CEG owned and occupied building A-1 (CEG office). CEG leased to ASC buildings A-2, A-3, A-4, A-5, B-1, and B-2 (collectively, ASC offices). DiDonato also occupied building A-5 for purposes of keeping a personal office, conference room, and secretarial center. He also claims to have "managed" his real estate out of building A-5. DiDonato never offered the ASC offices for rent to any

[*38] party other than ASC and did not advertise them for rent to any other party. On Schedules E attached to the 2003 and 2004 returns, petitioners reported rents from the ASC offices totaling $530,391 and $529,513, respectively. ASC claimed corresponding deductions on its 2003 and 2004 Forms 1120S. DiDonato also owned two additional rental properties which are not at issue in this proceeding.

X.    Tax Advice

A.    Overview

DiDonato has used the tax and accounting services of Amper, Politziner & Mattia, LLP  (Amper), since at least 1997 when the firm represented him in the prior audit. Staff at Amper prepared the 2003 and 2004 returns. Paul Dougherty, a certified public accountant and tax lawyer with 25 years' experience, supervised the preparation of and reviewed the 2003 and 2004 returns. Mr. Dougherty also provided petitioners with various tax advice for the years at issue. Petitioners obtained from Amper separate written tax advice with respect to DiDonato's 1995 real estate activities and Equipment Leasing's ownership and operation of the aircraft.

B.    Rental Real Estate Activities

On June 28, 1995, Amper provided to DiDonato an opinion letter (real estate opinion) addressing various aspects of DiDonato's real estate activities. As

**[\*39]** relevant here, the real estate opinion reflected a "will" comfort level that the

conservation easement contribution would yield a charitable contribution deduction

on DiDonato's individual return.[23]  The real estate opinion, without specifying the

property to which the expenses related, opined that DiDonato "will" be able to

"depreciate the building and take all the related expenses."  The real estate opinion

went on to state that the author of the letter had not fully researched the proper tax

treatment of rent-free occupancy of rental properties.  The remainder of the opinions

reached in the real estate opinion are so general as to have no usefulness for our

discussion.

    C.    <u>Aircraft Advice and Reporting Positions</u>

    1.    <u>Aircraft Letter</u>

On June 16, 1999, Amper provided to DiDonato a letter (aircraft letter)

stating its recommendation on how to structure the ownership and operation of

the fractional share.  The aircraft letter, less than two full pages in length, began by

recognizing DiDonato's intention to purchase the aircraft share for "business and

personal purposes."  After some general advice on owning the aircraft share

---

[23]In tax parlance there are a number of different "comfort levels" at which an opinion letter can be issued.  An opinion issued at the "will" level (as compared with the "should" or "more likely than not" levels) is generally the highest level of comfort.  <u>See</u> Robert P. Rothman, "Tax Opinion Practice", 64 Tax Law. 301, 311-319 (2011).

[*40] through Equipment Leasing, the aircraft letter advised DiDonato that personal use of the aircraft by him or his employees would be considered a fringe benefit includible in the gross income of the individual using the aircraft. The letter further advised DiDonato that Equipment Leasing's operating and management expenses may be limited due to personal use. Although the aircraft opinion concluded the use of the aircraft would be deductible by ASC as a travel expense, it did not address whether ASC's lease of the aircraft was an ordinary and necessary business expense. DiDonato did not secure any additional written tax advice on the aircraft share after 1999.

## 2.   DiDonato's Misstatements to Amper

Amper approved petitioners' claimed deductions for use of the aircraft share because, as DiDonato explained to Mr. Dougherty or his staff, the aircraft was not used for personal travel.[24] Neither Mr. Dougherty nor his staff reviewed the flight logs in connection with their preparation of the 2003 and 2004 returns. Mr. Dougherty acknowledged at trial that had he known that petitioners' children were on board the aircraft during the subject years, his firm would not have taken the reporting position that the aircraft was not used for personal travel.

---

[24]DiDonato advised Mr. Dougherty that when he flew for personal reasons, he flew commercial airliners. The record does not include any evidence showing that DiDonato flew on a commercial airliner at any time during the subject years.

[*41] XI.    Notice of Deficiency, Petition, and Amended Answer

Respondent issued to petitioners a notice of deficiency proposing various adjustments to the 2003 and 2004 returns.  First, respondent determined petitioners were not entitled to depreciation expense deductions for the Denali of $29,058 for 2003 and $7,005 for 2004.  Second, respondent determined CEG's gross receipts for 2004 were $5,214,381 and not $5,161,984 as reported on the 2004 return.  Third, respondent determined petitioners did not hold the 245 and 265 Cold Soil properties as rental properties, that all expenses related thereto were nondeductible personal expenses, and that petitioners' taxable income should be increased by $549,203 for 2003 and $477,511 for 2004.[25]  Fourth, respondent determined petitioners were not entitled to losses of $694 for 2003 and $19,994 for 2004 relating to Equipment Leasing's Aircraft share because petitioners had not established that the aircraft leasing expenses were ordinary and necessary business expenses or, in the alternative, that the aircraft leasing activity was a bona fide business venture entered into for profit, or that the substantiation requirements of

_____

[25]Respondent determined, in the alternative, that if the 245 and 265 Cold Soil properties were rental properties, then repair expenses claimed as deductions in the amounts of $257,268 for 2003 and $154,125 for 2004 were disallowed because, according to respondent, petitioners did not establish that the expenses were actually incurred or, if the expenses were actually incurred, then the expenses were capital expenditures that were not currently deductible.

**[\*42]** section 274(d) had been met. Fifth, respondent determined petitioners' share of "Other Income" from ASC was increased by $312,181 for 2003 and $343,363 for 2004 because, respondent determined, ASC was not entitled to deductions for (1) lease payments to Equipment Leasing for the aircraft share of $217,518 for 2003 and $262,745 for 2004, (2) employee achievement awards of $25,000 for 2003 and $21,501 for 2004, or (3) expenses for conferences and meetings of $69,663 for 2003 and $59,117 for 2004.[26] Sixth, respondent determined for 2003 a favorable adjustment allowing an additional capital loss of $2,384, which is not at issue. Seventh, respondent determined adjustments to petitioners' self-employment tax and the corresponding self-employment tax deductions. Eighth, respondent determined petitioners were entitled to additional itemized deductions for real estate taxes of $55,680 for 2003 and $56,934 for 2004. Ninth, respondent determined petitioners were not entitled to a charitable contribution deduction of $1,870,000 for 2004 relating to a land conservation easement. Tenth, respondent determined petitioners were not entitled to a dependency exemption deduction for DiDonato's father. Petitioners petitioned the Court in response to the notice of deficiency.

---

[26]The notice of deficiency determined that adjustments to "Other Income" related to CEG and not ASC, but the parties have stipulated that the adjustments related to ASC and not CEG.

**[\*43]**  Respondent amended his answer to assert increases to the 2003 deficiency and accuracy-related penalty.  Specifically, respondent alleged petitioners are not entitled to an accelerated depreciation expense deduction for 2003 but that they must use the straight-line depreciation method.  Respondent further contends petitioners must recapture for 2003 the excess depreciation claimed for 1999 through 2002.

OPINION

I.    Perception of Witnesses

During a three-day trial in New York, New York, we heard the testimony of four fact witnesses; namely, DiDonato, Brian M. Cohen, Mr. Dougherty, and Carol Domanski, respondent's revenue agent.  Our charge as the trier of fact is, in part, to review the credibility of witnesses and the reliability of evidence for purposes of finding disputed facts.  In discharging that duty, we observe the truthfulness, candor, and demeanor of each witness to evaluate his or her testimony.  See Diaz v. Commissioner, 58 T.C. 560, 564 (1972); Garavaglia v. Commissioner, T.C. Memo. 2011-228, 102 T.C.M. (CCH) 286, 296 (2011); HIE Holdings, Inc v. Commissioner, T.C. Memo. 2009-130, 97 T.C.M. (CCH) 1672,1733 (2009).  The evidence is weighed, necessary inferences are drawn, and disputed facts are resolved with a view toward ascertaining the truth.

**[*44]** It is fundamental to our system of jurisprudence that the presiding judge is "not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." Quercia v. United States, 289 U.S. 466, 469 (1933); see Geders v. United States, 425 U.S. 80, 86-87 (1976); Loque v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997); Warner v. Transam. Ins. Co., 739 F.2d 1347, 1351 (8th Cir. 1984); United States v. Beaty, 722 F.2d 1090, 1092-1093 (3d Cir. 1983). We have discretion to participate in the trial process, see United States v. Wilensky, 757 F.2d 594, 597 (3d Cir. 1985), and we may examine a witness so as to unearth the truth, ensure the proper administration of justice, and make certain that there is no misunderstanding of testimony, see Fed. R. Evid. 614(b); Beaty, 722 F.2d at 1093 (citing Riley v. Goodman, 315 F.2d 232, 234 (3d Cir. 1963)); Nordmann v. Nat'l Hotel Co., 425 F.2d 1103, 1109 n.3 (5th Cir. 1970) (citing Posey v. United States, 416 F.2d 545, 555 (5th Cir. 1969)). Of course, we are careful to temper our participation in the conduct of a trial to maintain impartiality, fairness, and justice. See Notes of the Advisory Committee on Fed. R. Evid. 614(b); see also Beaty, 722 F.2d at 1093 (citing United States v. Green, 544 F.2d 138, 147 (3d Cir. 1976)); United States v. Nobel, 696 F.2d 231, 237 (3d Cir. 1982).

[*45] After observing DiDonato at trial, we believe he is sophisticated in many subjects, including certain aspects of the Federal tax law, and we believe him to be a manipulator of the facts and of the law. For example, DiDonato testified that his father, for whom petitioners claimed a dependency exemption deduction and listed their qualifying relationship as "parent," was not a family member for purposes of qualifying the 265 Cold Soil property as a rental property. He testified that his taking private flights over weekends was necessary to ASC's business because he had "immense responsibilities" that demanded he be at ASC's offices Monday through Friday. Yet, when DiDonato testified about the time he purportedly devoted to his rental real estate activities, he stated that ASC "pretty much runs itself" and that his work there occupied "maybe" 5% of his time. DiDonato testified to the effect that he believed that he was entitled to deduct as business expenses the cost of the flights on which his children were present because, unlike the Federal building in which the trial was held, where there was apparently a daycare facility, "[w]e don't have daycare center[s] in the private sector."

DiDonato's testimony, especially with respect to his claimed business use of the aircraft, was repeatedly vague, confusing, and inconsistent. The Court, so as to facilitate our decisionmaking process and ascertain petitioners' use of the aircraft, questioned DiDonato on, among other items, the particulars of the Orlando trip. In

[*46] this regard, DiDonato's dialogue with the Court accentuates the unreliability of his testimony. Whereas passage of time tends to fade memories, manipulation of the facts can hardly be disguised as poor memory. The former is excusable; the latter is not. The following dialogue, which we believe to illustrate the unreliability of DiDonato's testimony, occurred at trial with respect to the Orlando trip in March 2003:

> The Court: So you say you went down and visited some business associates, right?
>
> DiDonato: Yeah, Dr. Barry Concool.
>
> The Court: Okay. How long did that take?
>
> DiDonato: Well, I don't remember. Let's see how many days we were there.
>
> The Court: It looks like you were there for five days.
>
> DiDonato: Yes, we were there for five days.
>
> The Court: So you visited him for one day. What did you do the other four days.
>
> DiDonato: Well, we didn't visit him for one day. We visited him for most of that time. I would say three days of that time. He -- let me tell you who Dr. Barry Concool is.
>
> The Court: That's all right. Let me ask you something. Where did you spend the night?
>
> DiDonato: I don't recall.

[*47] The Court:  You don't know if you spent it in Orlando?

DiDonato:  We may have spent the first night there.  I don't remember where we stayed.

The Court:  So let me understand this trip.  You flew to Orlando, right?

DiDonato:  Right.

The Court:  You arrived before noon.  Did you immediately leave to go see your business associate?

DiDonato:  Yes, we did.  We probably saw him the next morning, or we saw him that evening.

The Court:  You saw him that evening in Fort Lauderdale?

DiDonato:  Perhaps we did, yes.  I didn't keep records of my itinerary.

The Court:  You just said you spent the night in Orlando.

DiDonato:  I think we did.

The Court:  So you arrived, you drove two hours down to Fort Lauderdale, saw him for whatever you did for that evening, then you drove back to Orlando that night?

DiDonato:  No.  Generally -- what time of the year was this?  March.  It generally doesn't work that way.  With these small business jets --

The Court:  How [sic] tell me how it worked in this instance.

DiDonato:  In this instance, in this instance I don't remember why we flew to Orlando.  Probably it was weather-related.  I

[*48] remember when we went out of -- we tried to get out of Fort Lauderdale but they rescheduled us out of Homestead.  So there are thunderstorms there all the time, and they are always delaying us and moving us, canceling us, or making us go to another city.

The Court:   So are you saying you intended to go to Fort Lauderdale but you in fact had to go to go Orlando?

DiDonato:  That's probably what happened.

The Court:  Well, when you say "probably", you either know or you don't know.

DiDonato:  I don't remember what happened.

The Court:  All right.

DiDonato:  But I do remember --

The Court:  If you don't know it's better --

DiDonato:  I do remember flying out of Homestead.

The Court:  Listen to me.

DiDonato:  Okay.

The Court:  If you don't know, it's better to say "I don't know."

DiDonato:  Okay.

The Court:  Okay.  So now you arrive in Orlando at around noon and you drive down two hours to visit this associate and you say you spent the night back in Orlando.

DiDonato:  No, we never went back to Orlando.

[**\*49**] The Court:  Well, you said a few moment[s] ago that you spent the night in Orlando?

DiDonato:  On the front end.

The Court:  That's what I'm talking about.

DiDonato:  Right.

The Court:  What do you mean on the front end?

DiDonato:  On the arrival.

The Court:  So you didn't go the first day?

DiDonato:  My recollection is that we landed in Orlando, drove to Fort Lauderdale.  Then drove to Homestead, and flew home.  That's what the record shows.

The Court:  Yes.  I'm afraid I'm confused.  Let's try it again.  You arrive a little before noon on Thursday, March 13th, is that about right?

DiDonato:  Correct.

The Court:  Now what do you do after you arrive?

DiDonato:  Probably got a rental car.

The Court:  Okay, than what do you do?

DiDonato:  My recollection is we stayed there probably because the weather was bad.

The Court:  So you stayed in Orlando?

DiDonato:  Right.

[*50] The Court:  When did you go see the business associate?

DiDonato:  Probably the next day.

The Court:  Because a few moments ago you said you saw him that day in the evening and now you are saying something different.

DiDonato:  Well, I don't know.

The Court:  Okay.

DiDonato:  I don't know exactly.

The Court:  If you don't know say "I don't know."

DiDonato:  Yeah, I don't know what happened nine years ago.

The Court:  Okay, so now you're saying you went there the next day.  So how long did you spend with him the next day?

DiDonato:  Over the course of three or four days we --

The Court:  No, the next day how long did you spend?

The Witness:  All day.

The Court:  You spent from what, from 9 a.m. until 5:00 p.m. with him?

DiDonato: Correct.

The Court:  On Friday?

DiDonato:  Correct.

The Court:  Okay.

[*51] DiDonato:  Because that was a business day with patient care, we did patient care with him.

The Court:  All right.  So you spent the entire day with him.

DiDonato:  Right.

The Court:  You and your wife?

DiDonato:  Correct.

The Court:  Okay.  Where did you spend that night?

DiDonato:  Probably somewhere in Fort Lauderdale.

The Court:  You don't know?

DiDonato:  I don't remember the hotel.

The Court:  Okay.  Now the next day is Saturday.

DiDonato:  Right.

The Court:  What did you do on Saturday?

DiDonato:  We spent Saturday and Sunday with him.

The Court:  Doing what?

DiDonato:  Everything that you would do on a weekend.

The Court:  So it's personal stuff?

DiDonato:  No, business stuff.  We were --

The Court:  Well, you usually don't do business stuff on a weekend.

**[*52]** DiDonato:  I do.

The Court:  Okay, so what did you do with him?

DiDonato:  We were laying foundation.  He was the contact with TLC Laser Centers.  I am bound by a confidentiality agreement but if I'm allowed to discuss it here I will.

Petitioners' Counsel:  You are.

DiDonato:  Okay.  We were -- he was our go- between TLC Laser Centers, he was a contractor at TLC Laser Centers, and he was putting together a deal for TLC Laser Centers to buy our LASIK and Ambulatory Surgical Center, and he was going to receive a fee for that service.

The Court:  Okay.  So you woke up Saturday morning in Fort Lauderdale.

DiDonato:  Right.

The Court:  What time did you start with him?

DiDonato:  Eight - nine.

The Court:  And just the three of you?

DiDonato:  And his entire staff.

The Court:  And you worked the whole day?

DiDonato:  I believe I was there all day.

The Court:  When you say you believe, you either know or you don't know.

DiDonato:  Well, let's define all day.  We had patient care in

[*53] the morning, then he did laser procedures in the afternoon. He was probably done about three or 3:30, have you call it all day.

The Court: So he had procedures on a Saturday?

DiDonato: No, I'm still talking about Friday, sir.

The Court: Okay. Let's go to Saturday. Where were you on Saturday.

DiDonato: Saturday, woke up late in the hotel, met Dr. Concool for lunch probably and spent three or four hours --

The Court: When you say "I met him for lunch probably", you either did or you didn't.

DiDonato: I did.

The Court: You did meet him for lunch?

DiDonato: Right.

The Court: The three of you met for lunch?

DiDonato: Yes.

The Court: Okay. Then what happened?

DiDonato: Same thing on Sunday.

The Court: Well, what happened after lunch?

DiDonato: We went back to our hotel.

The Court: Which was where?

DiDonato: In Fort Lauderdale.

[*54] The Court:  Okay.  Now on Sunday what happens?

DiDonato:  Same thing.  We met him again.

The Court:  You met him again at nine in the morning.

DiDonato:  Yeah.  What time did we come home?  Did we come home Sunday or Monday?  Let's see.

The Court:  Actually you came home on Tuesday.

DiDonato:  Tuesday, okay.

The Court:  So you meet him again now on Sunday, right?

DiDonato:  Right.

The Court:  At nine in the morning?

DiDonato:  Right.

The Court:  Okay.  And now what happens?

DiDonato:  My recollection is that we were going to stay there Sunday and then fly home on Monday, and I think we flew home on Tuesday because we couldn't get out.

The Court:  Okay, but let's stay with Sunday.  You meet him at nine in the morning and what happens?

DiDonato:  What happened that Sunday?

The Court:  Yes.

DiDonato:  I don't recall.

The Court:  All right.

[*55] DiDonato:  But we spent the day with him.

The Court:  Okay.  You're sure you spent the day with him?

DiDonato:  Yeah, I'm sure I spent the day with him.  I spent the whole weekend with him.

The Court:  Okay.  Now we have Monday, what did you do on Monday?

DiDonato:  I think our plan was to come home on Monday but we couldn't get out.

The Court:  So what did you do?

DiDonato:  We had to go back and re-check into our hotel after we checked out.  Got on the plane, couldn't leave because of thunderstorms, so we ended up getting -- we wanted to go home.  We went out to another airport and we had to wait until the next day.  That happens frequently.

The Court:  Okay.

DiDonato:  With these winds.

The Court:  So where did you spend the night on Monday night?

DiDonato:  I don't know.  I don't have where we stayed at Fort Lauderdale?

The Court:  Because you left at 8:30 in the morning from Orlando.  So you got up real early on Tuesday morning, didn't you?

*      *      *      *      *      *      *      *

The Court:  So, if you spent that night in Fort Lauderdale and you left at 8:30 in the morning and it's a two-hour drive.

[*56] DiDonato:  According to this then we went back to Orlando. Yeah, that's what we did.

The Court:  When you say "according to this"?

DiDonato:  Your Honor, I can't remember nine years ago.

The Court:  Okay, I can understand that.  I can't remember nine years ago either, but the point is if you don't remember it's best to say "I don't remember" rather than coming up with a story.

DiDonato:  Well, no, I'm trying to be cooperative.  I'm trying to tell you what happened.

The Court:  I don't want you to cooperate by making things up. If you don't know say, "I don't know," and I'm satisfied with "I don't know."

DiDonato:  Okay.

The Court:  So is it I don't know?

DiDonato:  What was your question again?

The Court:  The question is did you spend the night, Monday night, March 17th in Fort Lauderdale and get up rather early --

DiDonato:  I don't know.

The Court:  Okay, that's fine.  So this flight leaves Orlando at 8:30 and goes to Homestead, why would that be so?  It's a 48 minute flight.  Why would you do that?

DiDonato:  I don't remember.

*     *     *     *     *     *     *

[*57] The Court:  If you forward yourself a little bit in the documents, you come across the meeting for Neurological Society March 13th to 15th in Orlando.  So you're saying you never attended that meeting because you were down in Fort Lauderdale.

DiDonato:  Well, you've got me confused now because these documents are all out of order.

The Court:  Well, take your time.  See if we can understand what happened.  Take a look at the Net Jets' memo dated Tuesday, March 18th.  Do you see that?

DiDonato:  Right.

The Court:  Okay, now flip to the next page, and it looks like there is a meeting in Orlando on March 13 through the 15th, and you're saying you never went to that meeting because you were in Fort Lauderdale.

DiDonato:  No, I went to that meeting.

The Court:  So you went to the meeting and you went to Fort Lauderdale.  That's a pretty good trip.  I don't see how you could spend all your time in Fort Lauderdale and still go to the meeting in Orlando.

DiDonato:  Well, obviously, your Honor, I had it mixed up.

The Court:  All right.  So your testimony was incorrect when you said you went to Fort Lauderdale?

DiDonato:  Well, they are out of order here.  Let's see.  Can I have one minute please.

The Court:  Surely.

DiDonato:  Well, obviously I misspoke.  I believe that I did go

[*58] down and meet with Dr. Concool and I did spend several days with him, but it didn't encompass this weekend. I'm trying to recall from nine years ago, but I obviously I made a mistake. I thought that was the Dr. Concool trip because I had written here Dr. Concool, that's my handwriting. But that threw me. I thought that was the trip with Dr. Concool. But clearly now I'm looking at the date of the neuro meeting, and that was the 13th, so what I was describing to you was another trip. [Emphasis added.]

Setting aside for the moment that portions of DiDonato's testimony were fabricated, as with the Orlando trip, his testimony was also internally inconsistent. For example, DiDonato testified that he and his family flew into Orlando because they wanted to take the drive to Fort Lauderdale, but he contradicted himself moments later by testifying the Orlando arrival was "weather related". After we heard him testify that he and his wife spent the duration of the Orlando trip in Fort Lauderdale, our review of the record revealed that his wife incurred a $560 charge for a Disney special activity in Lake Buena Vista, Florida, during the same weekend.[27] We assign very limited weight to DiDonato's testimony, and insofar as we discounted any part of that testimony, we did so because we perceived him to be untrustworthy when giving it.

In addition to our perception of DiDonato, we also draw certain adverse inferences from Ms. DiDonato's decision not to testify. The Supreme Court noted

---

[27]The bank statement on which this charge appears is buried about 265 pages into Exhibit 29-J.

**[\*59]** in United States v. Hale, 422 U.S. 171, 176 (1975): "In most circumstances silence is so ambiguous that it is of little probative force." The Supreme Court went on to note, however, that "[s]ilence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation." Id. Recently, in Loren-Maltese v. Commissioner, T.C. Memo. 2012-214, 104 T.C.M. (CCH) 115, 116 (2012), we reflected a similar sentiment in that we observed: "[P]eople have a natural tendency to defend their reputation, and that silence in the face of accusations suggests that there might be some merit to the charges."

Ms. DiDonato allegedly supervised administrative matters for CEG, she was ASC's corporate secretary, and she was a passenger on many of the flights at issue in this case, sometimes with her children. We regard Ms. DiDonato's absence from the trial of this case, especially given respondent's clear accusation that she used the aircraft share for personal purposes, as giving rise to an inference that her testimony would have been unfavorable to petitioners' position. Accord Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946) ("The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the

**[\*60]** presumption that if produced it would be unfavorable."), aff'd, 162 F.2d 513 (10th Cir. 1947).

As to petitioners' other witnesses, namely, Mr. Cohen and Mr. Dougherty, we found their testimony to be credible but not fully informed. The record supports that DiDonato was not forthcoming with his business associates (Mr. Cohen) or his tax adviser (Mr. Dougherty). Thus, although we generally credit these individuals' testimony, we appreciate fully that DiDonato failed to disclose material facts to them, rendering unreliable some of their testimony. We need not accept improbable, unreasonable, or unreliable testimony. See Barasso v. Commissioner, T.C. Memo. 1978-432, 37 T.C.M. (CCH) 1783 (1978), aff'd sub nom. De Cavalcante v. Commissioner, 620 F.2d 23 (3d Cir. 1980). Although we found respondent's sole witness, Ms. Domanski, to be credible, her testimony was of limited use to us in that she testified about DiDonato's rental activities only.

## II.    Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving those determinations erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). The Commissioner bears the burden of proof with respect to a new matter or increased deficiency pleaded in the answer. Rule 142(a). Where a case involves unreported

[*61] income and is appealable to the U.S. Court of Appeals for the Third Circuit, as this case is barring a contrary written stipulation, the Commissioner's determination of unreported income is not presumptively correct until the Commissioner produces foundational evidence linking the taxpayers to the tax-generating activity. See Anastasato v. Commissioner, 794 F.2d 884, 887 (3d Cir. 1986) (citing Gerardo v. Commissioner, 552 F.2d 549, 554 (3d Cir. 1977), aff'g in part, rev'g in part, and remanding T.C. Memo. 1975-341, 34 T.C.M. (CCH) 1480 (1975)), vacating and remanding T.C. Memo. 1985-101, 49 T.C.M. (CCH) 893 (1985). Whereas the burden of proof as to factual matters may shift to the Commissioner under section 7491(a), we conclude it does not do so here because, as discussed throughout this opinion, petitioners have not complied with the substantiation requirements of section 274 or maintained all records required under the internal revenue laws.[28] See sec. 7491(a)(2)(A) and (B).

III.    CEG's Unreported Income

Petitioners, relying on the 2004 trial balance, reported CEG's gross receipts for 2004 as $5,161,984. Respondent, pointing to the 2006 and 2011 trial balances, determined that petitioners underreported CEG's 2004 gross receipts by $52,397.

---

[28]Petitioners' brief is consistent in this result in that petitioners do not assert that sec. 7491(a) applies in this case.

[*62] Petitioners maintain that they computed CEG's 2004 gross receipts on the basis of the 2004 trial balance which, according to them, was a more accurate reflection of CEG's gross receipts for 2004 than the 2006 or 2011 trial balance. DiDonato testified at trial that the additional $65,354.23 with which CEG is charged as gross receipts was really a nontaxable capital contribution from him to CEG. We conclude that CEG's 2004 gross receipts were underreported by $52,397.

Gross income is defined in section 61 to include "all income from whatever source derived, including (but not limited to) * * * [g]ross income derived from business". Sec. 61(a)(2). As a general rule, items of gross income must be included in the gross income of a cash method taxpayer for the year in which the taxpayer actually or constructively received the income. See sec. 451(a); sec. 1.451-1(a), Income Tax Regs. Income not actually reduced to a taxpayer's possession is constructively received by a taxpayer in the year during which the income is credited to an account, set apart, or otherwise made available so that the taxpayer may draw upon it at any time. See sec. 1.451-2(a), Income Tax Regs.

Where taxpayers keep books and records that do not clearly reflect income, the Commissioner is authorized under section 446(b) to reconstruct the taxpayers' income using a method of accounting which, in the opinion of the Commissioner,

**[\*63]** clearly reflects income. Petzoldt v. Commissioner, 92 T.C. 661, 686-687

(1989). The Commissioner ordinarily regards an accounting method as clearly

reflecting income where the method the taxpayers chose reflects the consistent

application of generally accepted accounting principles in accordance with accepted

conditions and practices of the taxpayers' trade or business. Sec. 1.446-1(a)(2),

Income Tax Regs. The Commissioner's income reconstruction need not be exact,

but must be reasonable in the light of the surrounding facts and circumstances.

Petzoldt v. Commissioner, 92 T.C. at 687. Once the Commissioner offers sufficient

evidence linking the taxpayers with the income-generating activity, the burden of

persuasion is on the taxpayers to prove the income determinations erroneous. Rule

142(a).

Respondent meets his burden of production with the stipulated 2004, 2006,

and 2011 trial balances. The 2004, 2006, and 2011 trial balances each consistently

include in gross receipts the $1,877,193 ASC "paid" to CEG for surgical supplies for

January 1 through November 30, 2004. The 2004 trial balance, printed three hours

before CEG's business closed for the year, omits the $65,364.23 ASC "paid" to

CEG for surgical supplies in December 2004. Each of the 2006 and 2011 trial

balances, given to respondent after the 2004 return was audited, includes the

$65,364.23 in CEG's gross receipts. Given CEG's inconsistent treatment of

**[*64]** amounts received for surgical supplies across periods (i.e., December 2004 as compared with the rest of the year) and its books and records (i.e., the 2004 trial balance as compared with the 2006 and 2011 trial balances), we conclude that respondent was justified in recreating CEG's gross receipts under section 1.446-1(a)(2), Income Tax Regs. Thus, petitioners bear the burden of proving the determinations in error, see Rule 142(a), including whether amounts deposited to CEG were capital contributions, see Fin Hay Realty Co. v. United States, 398 F.2d 694, 699 (3d Cir. 1968).

Petitioners do not dispute that CEG received from ASC the $65,364.23 for the use of surgical supplies. Instead, petitioners assert that the amount they reported as CEG's gross receipts for 2004 was correct because, as they maintain, the 2004 trial balance used to compute CEG's gross receipts was the most accurate account of operations. We disagree. The 2004 trial balance is not a reliable statement of CEG's operations because it was printed before CEG closed its business for 2004. DiDonato confirmed this point when he testified that the purpose of his working on January 1 of each year was to close out CEG's books for the previous year. We agree with respondent it is likely that entries were made in the three or so hours after the 2004 trial balance was printed that resulted in the inconsistencies between the 2004 trial balance and the 2006 and 2011 trial

[*65] balances. Therefore, we reject petitioners' proposition that the 2004 trial balance was less reliable than the 2006 or 2011 trial balance.

Nor are we persuaded by DiDonato's testimony that the $65,364.23 was a nontaxable capital contribution from him to CEG. Petitioners did not offer any corroborating documentary evidence such as a canceled check, a check register, a bank statement, or another similar document. See Grossman v. Commissioner, T.C. Memo. 1994-231, 67 T.C.M. (CCH) 3001, 3003-3006 (1994) (rejecting taxpayers' claim of capital contributions in the absence of documentary evidence). Nor does the record establish that a capital contribution was necessary to the continuation of CEG's business. CEG was a mature optometry practice with sufficient working capital from its eyecare practice and sale of surgical supplies to ASC. Petitioners have not explained why CEG's financial needs were not met by its existing capital base. Absent documentary evidence to show that a capital contribution was made, and bearing in mind that such a contribution did not seem necessary to keep CEG a going concern, we reject DiDonato's testimony that the $65,364.23 was a nontaxable capital contribution to CEG.

Respondent's computation of CEG's gross receipts was reasonably based on the surrounding facts. The 2004 trial balance included $1,877,193 paid from ASC to CEG for the purchase of surgical supplies. The 2004 trial balance, however,

[*66] omitted $65,364.23 believed to have been paid from ASC to CEG for the purchase of surgical supplies in December 2004. The revenue agent followed the 2006 and 2011 trial balances, which both included $65,364.23 for the purchase of surgical supplies in December 2004. We conclude that respondent acted reasonably when including in CEG's gross receipts for 2004 the $65,364.23 for surgical supplies. The revenue agent, in an exercise of discretion, allowed CEG to reduce its gross receipts by $204,650.13 for CEG's payment of payroll and payroll taxes paid on behalf of ASC. Respondent did not challenge the related adjusting entries in his pleadings, and we will defer to the decision to allow them as an offset to gross receipts given the close relationship between CEG and ASC. Accordingly, we hold CEG's 2004 gross receipts are increased by $52,397.

IV.    CEG's Deductions--The Denali

Respondent determined petitioners were not entitled to depreciation expense deductions of $29,058 for 2003 and $7,005 for 2004 related to the Denali because, as he contends on brief, petitioners did not comply with the substantiation requirements of section 274(d). Petitioners rely on the testimony of DiDonato and Mr. Cohen, as well as a sample CEG patient log, to prove their entitlement to the claimed depreciation expense deductions. Petitioners, citing Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), and Vanicek v. Commissioner, 85 T.C.

**[\*67]** 731 (1985), ask the Court to estimate the allowable depreciation expense deductions to the extent they have not proven the amounts to which they believe they are entitled. We will sustain the disallowance of the depreciation deductions for the Denali.

Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 6001, in turn, requires taxpayers to maintain records sufficient to substantiate the amounts of the deductions claimed. See also sec. 1.6001-1(a), Income Tax Regs. Certain expenses specified in section 274 are subject to heightened substantiation requirements. Specifically, section 274(d)(4) provides that no deduction shall be allowed under section 162 for listed property unless the taxpayers substantiate, with adequate records, the following elements: (1) the amount of the expense; (2) the mileage for each business use of the vehicle as well as the total mileage for all purposes during the taxable period; (3) the date on which the property was used; and (4) the business purpose of the property. See sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). Section 280F(d)(4) defines the term "listed property" to mean, in addition to other property, any passenger automobile or any other property used as a means of transportation. Without adequate records, such as an account book, a diary, a log, a statement of expenses,

[*68] trip sheets, or a similar record, taxpayers still may substantiate mileage expenses with sufficiently detailed written or oral statements and other collateral evidence showing the expense was incurred. See sec. 1.274-5T(c)(2), (3)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017, 46020 (Nov. 6, 1985).

Although we are satisfied CEG occasionally used the Denali during the subject years for business purposes, we will not allow petitioners the depreciation deductions to which they claim entitlement. The Denali is listed property because CEG used it for transportation.[29] See sec. 280(f)(d)(4)(A)(ii). Thus, the section 274(d) substantiation requirements apply. Sec. 274(d)(4). The patient logs petitioners relied on to satisfy the substantiation requirements of section 274(d) are not reliable. The logs do not indicate whether it was the Denali or another one of the transport vehicles that was used to drive the particular patient. Nor do the logs state the number of miles driven, the origin, the destination, or any other information that would allow us to determine when, where, and for what purpose the Denali was driven. That being so, we do not treat the patient logs as adequate records within the meaning of section 274(d). See Royster v. Commissioner, T.C. Memo. 2010-16, 99 T.C.M. (CCH) 1077, 1079 (2010) (nonspecific documentary

---

[29]The Denali, because it weighed more than 6,000 pounds, was not deemed to be listed property as a passenger automobile under sec. 280F(d)(4). See sec. 280F(d)(5)(A).

**[*69]** evidence did not satisfy section 274(d) substantiation requirements); see also Fleming v. Commissioner, T.C. Memo. 2010-60, 99 T.C.M. (CCH) 1239, 1241 (2010) (absence of business purpose on logs meant they were inadequate substantiation under section 274(d)).

Nor does the testimony of DiDonato and Mr. Cohen qualify as sufficiently detailed oral statements showing the expense was incurred. Neither DiDonato nor Mr. Cohen made a specific showing as to the business purpose associated with the use of the Denali, the total miles driven for business and personal uses, or the dates on which the Denali was used. The record does not establish whether the Denali was predominantly used for business or personal reasons. Moreover, DiDonato testified that on at least one occasion he used the Denali to take his surgeons and staff "down the shore" for what he testified was a personal trip. Given the absence of specific testimony on the point, and bearing in mind that the Denali was used at least once for personal travel, we decline to conclude that the Denali was predominantly used for business purposes or that the substantiation requirements of section 274(d) have been met. See Dyer v. Commissioner, T.C. Memo. 2012-224, 104 T.C.M. (CCH) 145, 151 (2012); Royster v. Commissioner, 99 T.C.M. (CCH) at 1079; Larson v. Commissioner, T.C. Memo. 2008-187, 96 T.C.M. (CCH) 73, 77 (2008). Whereas petitioners urge us to apply the Cohan rule to allow them

[*70] depreciation expense deductions for the Denali, we are precluded from doing so because the section 274(d) substantiation requirements supersede the Cohan rule. See Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). Insofar as petitioners have not met the section 274(d) substantiation requirements or established that the Denali was predominantly used for business purposes, they may not claim a depreciation expense deduction for that vehicle for either of the subject years. Sec. 274(d)(4). Accordingly, we hold petitioners are not entitled to a depreciation expense deduction for the Denali of $29,058 for 2003 or $7,005 for 2004.

V.    ASC's Deductions and Increase to DiDonato's Distributable Income

    A.    Employee Achievement Expenses

        1.    Overview

Respondent disallowed ASC's claimed employee achievement award deductions of $25,000 for 2003 and $21,501 for 2004. The disallowed deduction for 2003 stems from two payments of $12,500 to DiDonato Builders. The disallowed deduction for 2004 is attributable to DiDonato's purchase of a $21,501 firearm for Mr. Witter in connection with DiDonato's possible sale of his ASC

[*71] shares of stock. We will sustain respondent's disallowance of these employee achievement expenses.

### 2. Guiding Principles

Sections 162 and 212 allow as a deduction all the ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business or for the production or collection of income. See secs. 162(a), 212(1). Among the potentially deductible expenses set forth in section 162 is a reasonable allowance for salaries or other compensation for personal services actually rendered. Sec. 162(a)(1). Personal, living, or family expenses are generally not deductible. Sec. 262(a).

### 3. Payments to DiDonato Builders

DiDonato testified that the payments from ASC to DiDonato Builders were for final payment of construction and maintenance work purportedly performed on the Hamilton office complex by Vincent, his cousin. Respondent contends that, other than DiDonato's self-serving testimony, the record does not support that the services were performed for business purposes. We will sustain respondent's determination as to the nondeductibility of payments to DiDonato Builders.

Taxpayers generally may not deduct the payment of another's expense. See Deputy v. du Pont, 308 U.S. 488 (1940); Dietrick v. Commissioner, 881 F.2d 336

[*72] 6th Cir. 1989), aff'g T.C. Memo. 1988-180, 55 T.C.M. (CCH) 706 (1988). The alleged bonuses paid to DiDonato Builders were purportedly for work done on buildings owned by CEG, Mallard, or DiDonato and merely leased to ASC. The record does not include a copy of any lease between ASC and CEG, Mallard, or DiDonato, and we thus have no way to know whether it was the lessor (ASC) or the lessee (CEG, Mallard, or petitioners) who was responsible for improvements to leased buildings. Even if we assume that ASC was responsible for improving the Hamilton office complex, which we do not, petitioners have not established that the employee achievement payments to DiDonato Builders are deductible.

The test for the deductibility of compensation payments, such as bonuses to a nonemployee, is whether the amounts are (1) reasonable in amount, and (2) paid for services actually rendered to the payor in or before the year of payment.[30]  See Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); sec. 1.162-7(a), Income Tax Regs.  Petitioners have not proven that either requirement for deductibility has been met.  First, petitioners offered no evidence, documentary or testimonial, as to whether the amounts paid to DiDonato Builders for work on ASC's leased space

---

[30]The record does not suggest that Vincent was an employee of ASC, and consequently, we do not consider the applicability of sec. 274(j) or sec. 1.162-9, Income Tax Regs., to this case.

**[\*73]** were reasonable in amount when compared with the amount of compensation paid to other builders for similar work.

Second, the record does not reveal whether the work DiDonato Builders allegedly completed was for space leased to ASC or to another one of DiDonato's businesses. Where a payment is made in the context of a family relationship, we carefully scrutinize the facts to ensure there was a bona fide business relationship and that the payment was not made on account of the familial relationship. See Commissioner v. Culbertson, 337 U.S. 733, 746 (1949); Martens v. Commissioner, T.C. Memo. 1990-42, 58 T.C.M. (CCH) 1288, 1292 (1990), aff'd without published opinion, 934 F.2d 319 (4th Cir. 1991). The record does not establish that DiDonato Builders rendered services to ASC in connection with the achievement awards or whether the builder was under a preexisting duty to provide those services. To the contrary, DiDonato only testified vaguely that DiDonato Builders worked on roughly 14 properties during a 12-to-15-year period. Among the work DiDonato Builders allegedly performed was fitting the interior of certain unspecified rental properties not owned by ASC, performing maintenance on some of DiDonato's rental properties which the record does not show ASC was obliged

[*74] to perform, and building out offices for DiDonato and ASC's surgeons.[31] This testimony does not fix whether the two $12,500 payments to DiDonato Builders related to services rendered in 2003 or in another year.

Moreover, we find a notable inconsistency between the statement on the invoices that the payments were a "bonus per agreement" and DiDonato's testimony that the payments were an oral settlement for work performed. We find it curious that DiDonato would accept as a final settlement release an invoice referring to the payment as a "bonus". We also question the business purpose of the payments, given that DiDonato Builders was the primary contractor for the personal residence. On the basis of the foregoing, we hold petitioners may not deduct employee achievement payments to DiDonato Builders totaling $25,000 for 2003.

4. Firearm Purchase

Petitioners claimed a deduction of $21,501 on ASC's 2004 Form 1120S for a firearm DiDonato gave to Mr. Witter in connection with Mr. Witter's efforts regarding the possible sale of DiDonato's shares of ASC stock. Respondent

---

[31]DiDonato did not reveal in his testimony that DiDonato Builders was the contractor named in multiple construction permits to improve the personal residence. Nor did he explain the extent to which, if at all, payments to DiDonato Builders for work completed on the personal residence overlapped with payments for work completed at ASC's offices.

[*75] maintains the deduction is not allowable for two reasons. First, respondent asserts that the cost of the firearm is not an ordinary and necessary business expense of ASC because it was purchased in connection with the possible sale of DiDonato's shares of ASC stock and so is a personal expense of DiDonato. Second, respondent argues that even if we were to conclude that the cost of the firearm was an ordinary and necessary expense of ASC, the amount of the deduction is limited to $25 under section 274(b). We agree that the cost of the firearm was not an ordinary and necessary expense of ASC and that the cost of the firearm is not deductible.

An expense is ordinary if it is considered normal, usual, or customary in the context of the particular business out of which it arose, see Du Pont, 308 U.S. at 495, and an expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business, see Welch v. Helvering, 290 U.S. at 113. The cost of a gift may be an ordinary and necessary business expense to the extent the gift is related to the taxpayer's opportunity to generate business income. Bruns v. Commissioner, T.C. Memo. 2009-168, 98 T.C.M. (CCH) 30, 35 (2009) (citing Brown v. Commissioner, T.C. Memo. 1984-120, 47 T.C.M. (CCH) 1255 (1984)). However, the amount of the deduction allowed for a gift is limited to $25 per donee per year. Sec. 274(b)(1). Moreover, section 274(d) requires that the taxpayer

**[*76]** claiming the gift amount as a deduction substantiate with adequate records (1) the cost of the gift, (2) the date and description of the gift, (3) the business purpose of the gift, and (4) the business relationship of the person receiving the gift. Sec. 1.274-5T(b)(5), Temporary Income Tax Regs., supra. Petitioners bear the burden of proving the extent to which (if at all) the firearm gift contributed to ASC's income. See Sutter v. Commissioner, 21 T.C. 170, 173-174 (1953).

Petitioners have not established that the firearm DiDonato gave to Mr. Witter was an ordinary and necessary business expense of ASC or that it increased ASC's future earnings potential. DiDonato testified to purchasing the firearm for Mr. Witter in connection with investment advisory services related to the possible sale of his shares of ASC stock. Expenses related to the sale of a shareholder's stock in a corporation are not deductible at the corporate level. Accord Snyder Bros. Co. v. Commissioner, T.C. Memo. 1980-275, 40 T.C.M. (CCH) 762, 772 (1980) (fees paid by a corporation for the sale of a shareholder's stock were expenses paid for the benefit of another and are nondeductible). Moreover, petitioners offered no evidence as to any future income ASC expected to realize from the services of Mr. Witter. Any goodwill that may have been realized from the gift of the firearm was to the personal benefit of DiDonato and not ASC. In this regard, the firearm was a personal gift born out of DiDonato's appreciation for services Mr. Witter provided

[*77] to him in connection with the possible sale of his shares of ASC stock.[32] An individual generally may not deduct his or her personal, living, or family expenses. See sec. 262(a). In view of the foregoing, we hold ASC, and therefore petitioners, may not deduct employee achievement expenses of $21,501 for 2004.[33]

## B. Conferences and Meetings

Petitioners claimed on ASC's 2004 Form 1120S deductions for expenses for conferences and meetings of $69,663 for 2003 and $59,177 for 2004. Respondent disallowed the claimed deductions because, as he states on brief, the expenses related almost exclusively to meals and entertainment expenses not properly substantiated under section 274(d). Petitioners sought to meet the substantiation requirements of section 274(d) through DiDonato's testimony and documentary evidence, including canceled checks and invoices. We conclude petitioners may

---

[32]Respondent also asserts, and we agree, that the substantiation requirements of sec. 274(d) have not been met with respect to the firearm. No evidence was offered at trial, and certainly not adequate records or detailed testimony, showing Mr. Witter's business relationship to ASC or that the gift of the firearm furthered a legitimate business purpose of ASC. Whereas the business relationship between Mr. Witter and DiDonato (in his capacity as ASC's shareholder) is apparent from the record, the same cannot be said of Mr. Witter and ASC.

[33]Because we conclude the firearm purchase was not an ordinary and necessary business expense of ASC, we need not decide whether sec. 274(b) limits the amount of the deduction to $25.

**[\*78]** not deduct the expenses for conferences and meetings as reported on ASC's 2003 and 2004 Forms 1120S.

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to the deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Section 274 imposes heightened substantiation requirements with respect to deductions for meals and entertainment expenses. No deduction is allowed for meals and entertainment expenses, unless the taxpayer establishes with adequate records or other credible evidence: (1) the amount of the expense; (2) the time and place of the entertainment; (3) the business purpose of the expense; and (4) the business relationship of the taxpayer to the persons entertained, including the name, title, or other designation sufficient to establish the business relationship to the taxpayer. See sec. 274(d); sec. 1.274-5T(b)(3), Temporary Income Tax Regs., 50 Fed. Reg. 46015 (Nov. 6, 1985).

Before a deduction is allowed for entertainment expenses, the taxpayer must establish that the expenditure was (1) directly related to the active conduct of the taxpayer's trade or business, or (2) associated with the active conduct of the trade or business where the expenditure was incurred directly before or directly after a substantial and bona fide business discussion. Sec. 274(a)(1)(A); see also sec. 1.274-2(a)(1), Income Tax Regs. An expenditure is for entertainment directly

[*79] related to the active conduct of a trade or business if, among other situations, (1) the taxpayer had more than a general expectation of deriving some income or other future benefit, (2) the entertainment occurred in a clear business setting in furtherance of the taxpayer's trade or business, (3) the entertainment was for the benefit of a nonemployee and in the nature of compensation for services rendered, or (4) the expenditure was a portion of club dues allocable to certain facilities used by the taxpayer to furnish food and beverages. See sec. 1.274-2(c), Income Tax Regs.

An expenditure for entertainment is associated with the active conduct of the taxpayer's trade or business where the taxpayer establishes a clear business purpose in incurring the expense, such as to obtain new business or to encourage the continuation of an existing business relationship. See sec. 1.274-2(d)(2), Income Tax Regs. For a taxpayer to establish a substantial and bona fide business discussion, the taxpayer must show that the taxpayer actively engaged in a business meeting, negotiation discussion, or other bona fide business transaction, other than entertainment, to obtain income or some other specific benefit. Sec. 1.274-2(d)(3)(i)(a), Income Tax Regs. In addition, the taxpayer must prove the business meeting, negotiation, discussion, or transaction was substantial in relation to the entertainment. Id.

[*80] Petitioner introduced into evidence canceled checks and invoices from most of the service providers to which the conference and meeting expenses relate. While these records establish that DiDonato paid amounts to various social clubs and proprietors, they are not adequate records under section 274(d) because they do not establish the time and place of the entertainment, the business purpose of the entertainment, or ASC's relationship to the person entertained. Petitioners' attempts to buttress their documentary evidence with DiDonato's testimony does not satisfy the strict requirements of section 274 because we find DiDonato's testimony in isolation to be not credible. See sec. 1.274-5T(c)(2), (3), Temporary Income Tax Regs., supra (the taxpayer must prove the business purpose of an expense with "direct evidence" such as a written statement or the oral testimony of the persons entertained).

As a preliminary matter, we note that DiDonato testified that CEG (and not ASC) paid the conference and meeting expenses at issue.[34] Even gratuitously construing DiDonato's testimony as confusing ASC and CEG, we reject the contention that he has satisfied the substantiation requirements of section 274. DiDonato did not name each of the individuals present at any of the 29 or 30

---

[34]In response to the question "[A]re these expenses that were paid by CEG?" DiDonato stated "Yes."

**[\*81]** conferences and meetings held in 2003 and 2004, respectively. He did not call these individuals to testify as to their presence at the conferences and meetings, their business relationship to ASC, or the business purpose of the conferences or meetings they purportedly attended. Nor did he state the business relationship between ASC and the persons entertained by, for example, giving the person's name, title, or other affiliation to ASC. We thus decline to find his testimony sufficiently detailed to satisfy the section 274 substantiation requirements. Accord Tyson v. Commissioner, T.C. Memo. 2009-176, 98 T.C.M. (CCH) 66, 70 (2009) (no meals and entertainment expense deductions where the business relationship between the taxpayer and the person entertained was not accompanied with the name, title, or other designation of the person entertained); Clooney v. Commissioner, T.C. Memo. 1999-194, 77 T.C.M. (CCH) 2156, 2159 (1999) (credit card statements and receipts alone do not establish a business purpose for the expense); Hankenson v. Commissioner, T.C. Memo. 1984-200, 47 T.C.M. (CCH) 1567, 1569 (1984) (costs of lunch meetings that did not have a stated business purpose were nondeductible personal expenses).

Moreover, DiDonato did not explain how the expenditures for conferences and meetings related to ASC's trade or business. DiDonato did not establish that ASC expected a future economic benefit as a result of any of the meetings, or that

[*82] any expense was incurred in a clear business setting. In addition, many expenses at issue were incurred at social clubs such as the Leash, the Philadelphia Club, and the Nassau Club, all of which bear strong personal elements. Multiple notes on invoices from the Leash indicated that the invoices could not be paid from business accounts, indicating to us further that these expenses were not for business. Accordingly, we hold petitioners may not deduct conference and meeting expenses of $69,663 for 2003 and $59,177 for 2004.

C.    Aircraft Leasing Expense

1.    Parties' Arguments

Respondent determined that ASC was not entitled to deduct lease payments of $217,518 for 2003 and $262,745 for 2004 to Equipment Leasing for use of the aircraft. Respondent asserts on brief that the aircraft lease was not an ordinary or necessary business expense of ASC because petitioners used the aircraft mostly for personal purposes that were unrelated to ASC's trade or business. Respondent, relying on Harbor Med. Corp. v. Commissioner, T.C. Memo. 1979-291, 38 T.C.M. (CCH) 1144 (1979), aff'd without published opinion, 676 F.2d 710 (9th Cir. 1982), also argues it was unreasonable for ASC to lease the aircraft from Equipment Leasing because, as respondent asserts, the cost of operating the aircraft was "exponentially greater" than commercial air travel. Lastly, respondent maintains

[*83] that ASC may not deduct the cost of the aircraft lease even if petitioners prove the aircraft was an ordinary and necessary business expense because, respondent contends, petitioners have not met the substantiation requirements of section 274(d). Petitioners counter that they used the aircraft for legitimate business purposes more than 50% of the time and that their children's presence on some of the flights does not limit their deduction. We conclude that petitioners have failed to show the use of the aircraft was primarily related to petitioners' business and that in any even they have not met the stringent substantiation requirements under section 274(d) to support the reported expenses.

## 2. Guiding Principles

Section 162 provides for a deduction of ordinary and necessary business expenses including traveling expenses paid or incurred in carrying on any trade or business. Sec. 162(a)(2). The Code recognizes traveling expenses as a type of expense for which a deduction under section 162 may be allowed. Like all trade or business expenses, traveling expenses are deductible only to the extent the expenditures are reasonably necessary in, and directly attributable to, the taxpayers' trade or business. Commissioner v. Flowers, 326 U.S. 465, 470 (1946); sec. 1.162-2(a), Income Tax Regs. When taxpayers travel to a destination and engage in both business and personal activities thereat, traveling expenses to and from the location

**[\*84]** are deductible only if the trip is primarily related to the taxpayers' business. Sec. 1.162-2(b)(1), Income Tax Regs. Whether a given trip is primarily related to the taxpayers' business or personal pursuits depends upon the facts and circumstances of each case. Sec. 1.162-2(b)(2), Income Tax Regs. As the trier of fact, we draw inferences and conclusions from the totality of the record, see Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 122-123 (1944), and whether traveling expenses are directly related to a trade or business is a primarily a factual determination, see Commissioner v. Heininger, 320 U.S. 467, 475 (1943). In deciding whether a trip is primarily personal, an important factor to consider is the amount of time during the trip spent on personal activities as compared with the amount of time spent on business activities. Sec. 1.162-2(b)(2), Income Tax Regs. Petitioners bear the burden of proving that the expense of leasing an aircraft was deductible.[35] See Rule 142(a).

---

[35]The Secretary recently promulgated regulations providing that if a corporate jet is used for both business and entertainment purposes, the corporation must allocate the actual aircraft expenses person by person and flight by flight between the two types of uses, under either an occupied-seat hours or occupied-seat miles method. See sec. 1.274-10, Income Tax Regs. (effective Aug. 1, 2012).

[*85]        3.  Analysis

Of the 10 trips taken in 2003, see supra pp. 22-23, at least 7 were completely personal; namely, trips 1, 2, 4, 5, 6, 7, and 10.[36]  As to trip 1, petitioners' children were on board; and although DiDonato provided inconsistent testimony as to whether he stayed in Orlando or Fort Lauderdale, Ms. DiDonato's credit card statements established that at least she was in or around Disney World.  As to trips 2, 4, 5, 7, and 10, DiDonato testified at trial that each of these trips were for the sale of his personal shares of ASC stock.  As explained at section V.A.4 of this opinion, expenses related to the sale of a shareholder's stock in a corporation are not deductible by the corporation as a business expense of the corporation.  See Snyder Bros. Co. v. Commissioner, 40 T.C.M. (CCH) at 772; cf. sec. 1.280F-6(d)(2), Income Tax Regs. (a qualified business use does not include use for which a deduction is allowable under section 212; i.e., for the production or collection of income or for the management, conservation, or maintenance of  property held for the production of income).  As for trip 6, DiDonato testified that Ms. DiDonato traveled to Rochester on a Friday and returned on a Sunday, purportedly to meet

---

[36]Insofar as petitioners' children were present on a flight and the flight was used in furtherance of the sale of DiDonato's shares of ASC stock, we count the flights only once as being in connection with the sale of DiDonato's shares of ASC stock.

**[*86]** with a supplier of eyecare products. We regard this trip as personal because Ms. DiDonato traveled on a weekend, her children were present on board the flight, and her family resided in the area.

The remaining trips taken in 2003, namely, trips 3, 8, and 9, had a business purpose that was questionable at best. As to trip 3, we question the business elements of that trip because we do not find credible DiDonato's testimony that he flew to Washington on a Sunday primarily to attend a seminar at his law firm and doubt there was a legitimate business purpose for the trip. As to trips 8 and 9, purportedly for a conference at the Vision Expo in Las Vegas and to visit a research facility, respectively, petitioners have failed to persuade us with credible evidence that these trips were primarily motived by a business purpose. Thus, we conclude that expenses reported and incurred in connection with the use of the aircraft in 2003 were personal.

Of the 12 trips taken in 2004, see supra pp. 24-25, at least seven of those trips were completely personal; namely, trips 2, 3, 4, 7, 8, 10, and 12. As to trips 2, 3, 4, 7, and 8, DiDonato testified at trial that each of these trips was for the sale of his personal shares of ASC stock. As just explained, expenses related to the sale of a shareholder's stock in a corporation are not deductible by the corporation as a business expense of the corporation. See Snyder Bros. Co. v. Commissioner, 40

[*87] T.C.M. (CCH) at 772; cf. sec. 1.280F-6(d)(2), Income Tax Regs. (a qualified business use does not include use for which a deduction is allowable under section 212; i.e., for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income). As to trip 10, a trip to East Hampton, we conclude the trip was personal, seeing that petitioners flew to East Hampton with Dr. Stein and flew back to New Jersey without the doctor after a lengthy layover. DiDonato did not explain why it was necessary to ASC's business that he and his wife be present on the flight to East Hampton, and he did not explain what he and his wife did during the layover they had while in East Hampton. We thus conclude that trip 10 was for personal purposes. As to trip 12, a flight Ms. DiDonato and her children took to Rochester, we conclude this trip was personal for the same reasons stated above.

As to the other five trips taken in 2004, petitioners have not shown a primary business purpose existed. As to trip 1, from Trenton, New Jersey, to Atlanta, Georgia, DiDonato testified that he and Ms. DiDonato took this trip to attend the Southern Council of Optometry meeting. Petitioners offered no supporting details to corroborate the business purpose of this trip, and we decline to accept DiDonato's self-serving testimony on the issue. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). As to trips 5, 6, and 9, DiDonato testified that he flew to

[*88] Washington to meet with his lawyers and his congressman, but he failed to show that these trips was made primarily to further a legitimate business purpose. As to trip 9 specifically, we note that petitioners' children were on board this flight, suggesting there were personal or recreational elements to this trip as well. Finally, as to trip 11, another trip to a conference in Las Vegas, which we find inherently suspect, petitioners have not persuaded us that it was primarily related to a legitimate business purpose. For reasons explained, we conclude expenses reported and incurred in connection with the use of the aircraft in 2004 were also personal.

Even if we were to believe that one or more of the trips taken had a legitimate business purpose, we agree with respondent that no deductions are allowed because the heightened substantiation requirements of section 274(d) have not been met. See Lysford v. Commissioner, T.C. Memo. 2012-41, 103 T.C.M. (CCH) 1217, 1220-1221 (2012) (declining to credit the taxpayer with business use of a personal aircraft where the taxpayer did not maintain written documentary evidence of the business purpose of the flights, the names of persons visited, or a description of the business actually or attempted to be conducted); Weekend Warrior Trailers, Inc. v. Commissioner, T.C. Memo. 2011-105, 101 T.C.M. (CCH) 1506, 1521 (2011) (general testimony of individuals who flew on an airplane and

[*89] their alleged business relationship, without specific testimony as to the business purpose for each airplane use, did not satisfy the substantiation requirements of section 274). See generally Sanford v. Commissioner, 50 T.C. at 827 (section 274(d) supersedes the Cohan rule); sec. 1.274-5T(a), Temporary Income Tax Regs., supra.

D.  Effect of Disallowed Deductions

The disallowed deductions result in increases to ASC's income. Because DiDonato was ASC's sole shareholder during the subject years, it follows that petitioners must include in income 100% of the adjustments on Schedule E. See sec. 1366.

VI.  Mallard's Expenses for the 245 and 265 Cold Soil Properties

A.  Overview

Respondent disallowed Schedule E rental real estate expenses relating to the 245 and 265 Cold Soil properties of $549,203 for 2003 and $477,511 for 2004. In support of his position, respondent raises three related arguments. First, he asserts petitioners (or Mallard) did not hold the 245 and 265 Cold Soil properties as rental properties during the subject years. Second, he maintains all expenses claimed for the 245 and 265 Cold Soil properties are nondeductible personal expenses. Third, he avers petitioners were not engaged in the rental real estate or farming activities

**[*90]** for profit.  Petitioners assert that expenses incurred in the ownership, management, and rental of the 245 and 265 Cold Soil properties were deductible. We agree with respondent that petitioners' deductions of the expenses are limited as stated herein.

B.      Whether the 245 and 265 Cold Soil Properties Were Rental Properties

Respondent asserts that all of the claimed expenses related to the 265 Cold Soil property are nondeductible because, he contends, neither property was held as a rental property for either of the subject years.  With respect to the 265 Cold Soil property, respondent cites section 280A(d) as standing for the proposition that the property is deemed to have been used for personal purposes by virtue of his father's residing there.  As to the 245 Cold Soil property, respondent argues the property is not a rental property because, as he sees it, petitioners failed to establish that they received rent from the property.  Petitioners argue that the 245 and 265 Cold Soil properties were each rented at a fair rent and, with respect to the 265 Cold Soil property, section 280A(d) does not disallow the claimed expense deductions for the property.  We agree with respondent that expense deductions claimed with respect to the 265 Cold Soil property are disallowed under section 280A(d), and we hold that petitioners may deduct only the expenses, i.e., real estate taxes, specified

[*91] herein.  We disagree with respondent that the 245 Cold Soil property was not held as a rental property for the subject years, though we conclude that deductible "losses" related to the 245 Cold Soil property are limited by section 183(b).

Section 280A disallows otherwise allowable deductions with respect to a dwelling unit used as a taxpayer's residence.  Section 280A(d)(1) provides that a taxpayer is considered to have used a dwelling unit as a residence where the property is used for personal purposes for a number of days which exceeds the greater of 14 days or 10% of the number of days during which the property is rented at a fair rent.  Section 280A(d)(1) specifies that a dwelling unit may not be treated as rented at fair rental value for any day for which the property is used for personal purposes.  In general, a taxpayer is generally deemed to have used a dwelling unit for personal purposes if, during any part of a day, a member of the taxpayer's family (as defined in section 267(c)(4)) uses the unit for personal purposes.  Sec. 280A(d)(2).  A member of the taxpayer's family includes, among other enumerated relationships, the taxpayer's ancestors.  Sec. 267(c)(4).

Notwithstanding the general rule that a family member's use of a dwelling unit is imputed to the taxpayer, a taxpayer is not treated as using the property for personal purposes for any period where the dwelling unit is rented to the family member for use as the family member's personal residence at a fair rent.  Sec.

[*92] 280(d)(3)(A). DiDonato's father rented the dwelling at the 265 Cold Soil property during the entire period of the subject years. Therefore, under section 280A(d), DiDonato is deemed to have used the dwelling unit on that property for personal purposes under section 280A(d), and so his rental expenses may not be deducted unless the dwelling was rented at a fair rent.

The determination of whether a dwelling unit is rented at a fair rent is made in the light of the facts and circumstances that existed when the rental agreement was entered into. See sec. 280A(d)(2)(C); sec. 1.280A-1(e)(3)(iii), Proposed Income Tax Regs., 48 Fed. Reg. 33320 (July 21, 1983). Although the term "fair rent" is not defined in the Code or the regulations under section 280A, the legislative history makes clear that the fairness component be determined on the basis of comparable rents in the area. See H.R. Rept. No. 97-404, at 8 (1981); see also Senate Explanation to Pub. L. 97-119, 27 Cong. Rec. S15487 (daily ed. Dec. 16, 1981). Petitioners bear the burden of proving the fair rental value of the dwelling unit. See Rule 142(a); Crotty v. Commissioner, T.C. Memo. 1990-261, 59 T.C.M. (CCH) 691, 695-696 (1990); Smith v. Commissioner, T.C. Memo. 1985-446, 50 T.C.M. (CCH) 904, 905 (1985); Bindseil v. Commissioner, T.C. Memo. 1983-411, 46 T.C.M. (CCH) 764, 765 (1983).

[*93] Petitioners offered no evidence at trial as to the fair rental value of the 265 Cold Soil property other than DiDonato's testimony that the amount of rent to be charged was set by his tax attorney and, in DiDonato's view, the rent was fair by virtue of his belief that the property was in "deplorable shape". DiDonato's testimony alone is unpersuasive. The record does not include the methodology, if any, the tax attorney used to determine the fair rental value. Because petitioners did not call this individual to testify on their behalf, we do not have the benefit of his reasoning. Nor does the record include evidence as to the fair rental value of comparable homes in the area surrounding the 265 Cold Soil property. We decline to accept DiDonato's uncorroborated and self-serving testimony that monthly rent of $400 for a single-family residence in New Jersey was fair rental value. See Gerdau Macsteel, Inc. v. Commissioner, 139 T.C. ___, ___ (slip op. at 143) (2012); see also Tokarski v. Commissioner, 87 T.C. at 77; Barasso v. Commissioner, T.C. Memo. 1978-432. In the absence of reliable evidence that the 265 Cold Soil property was rented at fair rental value, we conclude that it was not. See Epstein v. Commissioner, T.C. Memo. 1994-34, 67 T.C.M. (CCH) 2046, 2051 (1994) (the failure of a party to introduce evidence as to the fair rental value of a dwelling unit creates a presumption that the evidence would be unfavorable to that party's position); Roy v. Commissioner, T.C. Memo. 1998-125, 75 T.C.M. (CCH) 2081,

**[\*94]** 2083 n.3 (1998) (taxpayers could not prevail in the absence of evidence on the fair rental value of that portion of a dwelling unit rented); <u>Bindseil v. Commissioner</u>, 46 T.C.M. (CCH) at 765 (taxpayer not able to prevail in the absence of expert evidence to support his claim of fair rental value). As far as Mallard's books and records suggest, DiDonato's father paid no rent at all. This documentary evidence (or lack thereof) is consistent with testimony of respondent's revenue agent, who testified that rent was not received by Mallard or petitioners.

We are mindful of section 1.280A-1(e)(6), Proposed Income Tax Regs., 48 Fed. Reg. 33320 (July 21, 1983), which states that a taxpayer shall not be deemed to have used a dwelling unit for personal purposes on any day on which the principal purpose of the unit's use was to perform repair or maintenance work on the dwelling unit. Still, our conclusion is unchanged. The record abounds with evidence showing that most (if not all) of the repairs and maintenance to the 265 Cold Soil property related to work on two barns, several smaller structures, a chicken coop, grounds, and other like alterations. While DiDonato testified about general improvements to the dwelling house on the 265 Cold Soil property, he did not offer specific testimony about whether the work performed qualified as repairs and maintenance on the dwelling unit. Indeed, a pretrial request respondent made

[*95] to the Township of Lawrence pursuant to New Jersey's Open Public Records Act, N.J.S.A. sec. 47:1A-1, et seq., and requesting information as to work performed on the 265 Cold Soil property, revealed that construction permits for the dwelling house of that property had not been issued until late 2009. The lack of evidence on fair rental value of the 265 Cold Soil property, coupled with the testimony of respondent's revenue agent that the dwelling unit at the 265 Cold Soil property had not undergone significant repairs or maintenance, leads us to conclude that the 265 Cold Soil property was used for DiDonato's personal purposes under section 1.280A-1(e)(6), Proposed Income Tax Regs., supra.

As to the 245 Cold Soil property, respondent argues the property is not a rental property because, he posits, petitioners failed to establish that they received rent from the property. We are not persuaded. Included in the record is a rental agreement reciting that DiDonato leased to Mr. Richen for $800 per month the dwelling house located at the 245 Cold Soil property. The record does not include evidence suggesting that Mr. Richen was a member of DiDonato's family within the meaning of section 267(c)(4). We thus find that section 280A does not require the disallowance of any of the expenses petitioners claimed with respect to the 245 Cold Soil property.

[*96] Pursuant to section 280A(d)(2)(A), petitioners are deemed to have used the dwelling at the 265 Cold Soil property for personal purposes during the subject years, because the record does not establish that the 265 Cold Soil property was rented at fair rental value at any point during the subject years. Therefore, none of the claimed deductions are allowable under section 280A(c)(3) and (e)(1), except deductions allowable without regard to their connection with DiDonato's rental real estate activities; specifically, property taxes of $50,090 for 2003 and $51,081 for 2004 are the only claimed expenses for which deductions are allowed. See sec. 164(a)(1). Insofar as the 265 Cold Soil property was not a qualified residence to petitioners under section 163(h)(4)(A)(i) they are not entitled to mortgage interest deductions with respect to that property. See Epstein v. Commissioner, 67 T.C.M. (CCH) at 2049 n.4.

C. Whether Petitioners' Real Estate Activities Were Entered Into for Profit

1. Overview

Respondent claims that petitioners may not deduct expenses relating to the 245 and 265 Cold Soil properties because petitioners did not hold either property with the primary purpose of making a profit. Petitioners are deemed to have used the 265 Cold Soil property for personal purposes throughout the subject years, and

**[*97]** we therefore need not decide whether section 183 applies for that property. See sec. 280A(f)(3) (where section 280A(a) applies with respect to the use of a dwelling unit for any year, section 183 generally does not apply to that unit for that year); sec. 1.183-1(g), Proposed Income Tax Regs., 37 Fed. Reg. 13679 (July 13, 1972). After considering the claimed deductions relating to the 245 Cold Soil property in the light of section 183, we agree with respondent and conclude that petitioners' activities with respect to that property were not engaged in for profit.

Sections 162 and 212 allow a deduction for all the ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business or for the production or collection of income. See secs. 162(a), 212(1). Section 183 generally limits deductions for an activity not engaged in for profit to the amount of the activity's gross income. Sec. 183(b). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

2. Whether Petitioners' Real Estate Activities Should Be Aggregated or Examined in Isolation

Petitioners contend on brief that the Court should consider DiDonato's real estate activities in the aggregate when evaluating his section 183 profit motive

[*98] because petitioners purportedly elected to aggregate his rental real estate activities as one activity under section 469(c)(7)(A).[37] We decline to do so for two reasons. The first reason is lack of conforming proof. The record does not include a copy of petitioners' (or DiDonato's) Federal income tax return showing a proper election was made under section 469 to aggregate the real estate activities as a single activity. See sec. 1.469-9(g)(3), Income Tax Regs. (requiring an election to be made on a statement accompanying the taxpayer's original tax return). In the absence of reliable documentary evidence establishing that such an election was properly made, we decline to conclude it was.

The second reason is a blend of law and fact. The regulations promulgated under section 183 specify that, as an initial matter, in determining whether section 183 applies for a particular activity of the taxpayer, a determination must be made as to the scope of the activity. Sec. 1.183-1(d)(1), Income Tax Regs. The activity to be considered under section 183 may encompass a single undertaking by the taxpayer or the activity may comprise several undertakings by the taxpayer. Id. For purposes of section 183, each undertaking may be its own activity or several

_____

[37]Petitioners claim on brief, as they stated at trial, that DiDonato elected to aggregate his rental real estate activities under sec. 465. We are unaware of any election available under sec. 465 allowing a taxpayer to aggregate his or her rental real estate activities. We understand petitioners to refer to the election available under sec. 469(c)(7)(A).

**[\*99]** undertakings may be treated as a one activity.  Id.  In ascertaining whether the

taxpayer's multiple undertakings constitute a single activity or separate activities, all

the facts and circumstances of the case are taken into account.  Id.  In general, the

most important facts and circumstances to be evaluated in deciding the scope of the

activity are the degree of organizational and economic interrelationship of the various

undertakings, the similarity of the undertakings, and the extent to which the overall

business purpose is or may be served by carrying on the various undertakings

separately or together.  Id.  Where it is determined that the taxpayer's multiple

undertakings are separate activities, deductions and income attributable to each

activity must be treated separately and cannot be aggregated in determining whether

an activity is subject to section 183 or when applying the section 183 loss limitation

for that activity.  Id.

Significantly, regulations interpreting section 183 provide an example of a

taxpayer who engages in farming on land purchased or held primarily for profit from

appreciation.  See sec. 1.183-1(d)(1), Income Tax Regs.  In such an instance, the

farming and the holding of the land will ordinarily be considered a single activity

only if the farming activity reduces the net cost of carrying the land for its

appreciation in value.  Id.  Thus, the farming and the holding of land will be

considered a single activity only if the income derived from the farming activity

**[\*100]** exceeds the deductions attributable to the farming activity that are not directly attributable to holding the land. Id.

Applying these general principles in this case, we will treat petitioners' real estate undertaking with respect to the 245 Cold Soil property as a separate activity for purposes of section 183. As we find, the facts and circumstances of this case lead us to conclude that the undertaking involving the 245 Cold Soil property was not sufficiently interrelated to petitioners' other rental real estate undertakings so as to constitute a single activity. DiDonato's rental real estate activity in respect of the 245 Cold Soil property was limited to renting to Mr. Richen the dwelling house on that property. The rental real estate activity with respect to the 265 Cold Soil property was also limited to renting to DiDonato's father the dwelling house on that property. The undertaking as to the 245 Cold Soil property was not related to the undertaking as to the 265 Cold Soil property. To the contrary, DiDonato specifically rejected offers from developers to purchase the properties. Moreover, since 1997, DiDonato had sold property rights related to the personal residence and the 245 and 265 Cold Soil properties without any apparent regard for the possible development of these properties in a subdivision. Nor do DiDonato's commercial rental real estate activities bear any apparent relationship to his undertakings at the 245 or 265 Cold Soil property. Considering the foregoing, we will examine

[**\*101**] DiDonato's profit objective with respect to the 245 Cold Soil property independent of his other rental real estate undertakings.

### 3. Guiding Principles

The test for deciding whether an activity is engaged in for profit is whether the taxpayers entered into the activity with an "'actual and honest objective of making a profit.'" See Elliott v. Commissioner, 84 T.C. 227, 236 (1985), aff'd without published opinion, 782 F.2d 1027 (3d Cir. 1986); Purdey v. Commissioner, T.C. Memo. 1989-657, 58 T.C.M. (CCH) 947, 950 (1989) (quoting Dreicer v. Commissioner 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1204 (D.C. Cir. 1983)), aff'd without published opinion, 922 F.2d 833 (3d Cir. 1990). In this context, the term "profit" focuses on economic profit independent of tax savings. Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Fox v. Commissioner, 80 T.C. 972, 1006 (1983), aff'd without published opinion sub nom. Rosenblatt v. Commissioner, 734 F.2d 7 (3d Cir. 1984). A reasonable expectation of profit is not needed, but the facts and circumstances must indicate the taxpayers entered into or continued the activity with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs. In determining whether an activity is engaged in for profit, we lend greater weight to objective facts than to a taxpayer's statements of his or her intent. Id.

[*102] Regulations interpreting section 183 include a nonexclusive list of objective factors to be evaluated in determining whether an activity is engaged in for profit. The factors to be considered are: (1) the manner in which the taxpayers carry on the activity; (2) the expertise of the taxpayers or their advisors; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayers in carrying on other similar or dissimilar activities; (6) the taxpayers' history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayers; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No single factor is outcome determinative, and we may look to factors not specifically enumerated. Id.

### a. Petitioners' Conduct of Their Activity

The fact that taxpayers carry on their activity in a businesslike manner may indicate the existence of a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. In deciding whether a taxpayer conducted an activity in a businesslike manner, we consider whether complete and accurate books and records were kept, whether the activity was conducted in a manner substantially similar to other comparable for-profit activities, and whether changes were made in an attempt to earn a profit. Id.

**[*103]** Although petitioners maintained books and records for Mallard and engaged Amper to prepare the 2003 and 2004 returns, we are not persuaded they conducted their real estate activity as to the 245 Cold Soil property in a businesslike manner. Respondent's revenue agent testified credibly that petitioners' representative told her during the audit that rental income from the 245 Cold Soil property was never received (or collected) from the tenants. We credit this testimony in the light of the fact that Mallard's books failed to report rental income from the 245 Cold Soil property. We further credit the revenue agent's testimony given that Mallard's books and records showed that petitioners (or Mallard) received rental income in respect of DiDonato's seven other rental properties. The record does not include copies of canceled checks or bank account statements showing that rental income was received for the 245 Cold Soil property, further leading us to conclude that petitioners were not concerned with receiving the rental income of the 245 Cold Soil property.

Moreover, we are unpersuaded that petitioners ever meaningfully changed any aspects of their rental activity of the 245 Cold Soil property with the primary objective of making a profit. The annual expenses petitioners claimed for the 245 Cold Soil property, net of depreciation, exceeded the annual income earned from

[*104] that property by $215,729 for 2003 and $211,973 for 2004.[38]  Simply for petitioners to break even during the subject years, a tenant residing in the 245 Cold Soil property would have to have paid monthly rent of roughly $18,777 for 2003 and $18,464 for 2004, significantly greater than the $400 per month charged to Mr. Richen (or his successor).[39]  No explanation was provided at trial as to the grossly disproportionate charge of income to expense or how (if at all) petitioners intended to ultimately profit from the 245 Cold Soil property.  This factor disfavors a finding that a profit objective existed.

> b.  Petitioners' Expertise in the Rental Real Estate Activity

We next consider the level of expertise of petitioners or their advisers with respect to the rental of the 245 Cold Soil property.  Extensive study of accepted business practices within a given activity or a willingness to consult with experts therein may connote the existence of a profit objective.  Sec. 1.183-2(b)(2), Income Tax Regs.  Where taxpayers have made such preparation or procured such expert advice but do not carry on the activity in accordance with such practices, a lack of

---

[38]Calculated as total Schedule E expenses for the 245 Cold Soil property ($244,215 for 2003 and $248,214 for 2004), less depreciation expense ($18,886 for 2003 and $26,641 for 2004), less rental income ($9,600 for 2003 and 2004).

[39]Calculated as total Schedule E expenses for the 245 Cold Soil property, net of depreciation ($225,329 for 2003 and $221,573 for 2004) divided by 12 months.

[*105] intent to derive profit may be indicated unless it appears that the taxpayers are aiming to develop a new or superior technique which may result in profits from the activity. Id.

Although we agree with petitioners that DiDonato possessed the requisite expertise in real estate management to indicate a profit objective, we are unwilling to find that the rental real estate activity at the 245 Cold Soil property showed a bona fide profit objective. DiDonato incurred expenses for the 245 Cold Soil property, net of depreciation expense, of almost $450,000 for the subject years on an investment that yielded him a mere $19,200 of rental income for the same years. Finally, we question DiDonato's motivation for substantially improving the grounds of the 245 Cold Soil property. As DiDonato testified on direct examination, he did not incur these expenses to make his rental real estate activity more profitable but "to maintain the reduced farmland/agricultural property tax assessment." We treat this testimony as direct evidence of his desire to obtain favorable tax treatment and not to make profitable the 245 Cold Soil property rental real estate activity. This factor weighs against finding a profit objective.

c.  The Time and Efforts Expended by Petitioners

The taxpayers' dedication of much time and effort to carrying on an activity may indicate a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs. Although

[*106] DiDonato claimed at trial to have devoted between 60% and 70% of his time to his real estate activities, we decline to credit this testimony for a few reasons. First, DiDonato rented the 245 and 265 Cold Soil properties and nine commercial rental buildings only to ASC, his father, Mr. Richen, or another individual throughout the subject years. Second, DiDonato's testimony concerning the amount of time he spent managing his rental properties was inconsistent. In this regard, DiDonato contradicted his testimony about the amount of time devoted to his rental real estate activities when he testified to "immense responsibilities" at ASC and that he "tr[ies] to be there Monday through Friday." DiDonato went on to contradict himself by later testifying that ASC "pretty much runs itself" and that he spends "maybe five percent" of his time at ASC and that he spends the rest of his time (i.e., roughly 95% of his time) managing real estate. We do not credit DiDonato's conflicted testimony in the absence of documentary evidence to support the amount of time he claims to have spent managing his rental real estate activity. The record does not include a logbook, a diary, a planner, or other reliable evidence from which we might deduce the hours he actually spent on his rental real estate activity. In view of the fact that most of DiDonato's rental real estate activities occurred between related entities or parties, we conclude he did not

**[*107]** expend as much time and effort on his rental real estate activities as he claims to have done. This factor weighs against the finding of a profit objective.

d. Expectation of the 245 Cold Soil Property's
Appreciation in Value

For purposes of section 183, the term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Sec. 1.183-2(b)(4), Income Tax Regs. Even if no profit is derived from the current operation of the activity, the taxpayers may intend that an overall profit will result when appreciation in the value of the asset used in the activity is realized because income from the activity together with the appreciation of the asset will exceed expenses of operation. Id.

Petitioners presented no specific evidence regarding the likelihood of any appreciation in value of the 245 Cold Soil property or how DiDonato intended to recoup losses related to that property. DiDonato sold development rights to Mercer County with respect to the 245 Cold Soil property, see DiDonato v. Commissioner, 101 T.C.M. (CCH) at 1739-1741, he declined offers from real estate developers to sell the property, and he erected barns, chicken coops, and fences on the land. The weight of this evidence suggests to us that DiDonato did not hold the 245 Cold Soil property for appreciation but for personal reasons lacking a profit objective. This factor disfavors our finding a profit objective.

**[\*108]**          e.          <u>Petitioners' Success in Carrying On Similar Activities</u>

We next examine petitioners' success in carrying on other similar activities. The taxpayers' success in similar activities may indicate the taxpayers had a profit objective even though the current activity is not presently profitable.  Sec. 1.183-2(b)(5), Income Tax Regs.  DiDonato had previously worked with rental real estate properties, but he has not shown the profitability or success of his endeavors with reliable evidence.  DiDonato testified that he first got involved with rental properties at the age of 18 and that since that time he has purchased, sold, owned, managed, or mortgaged at least 75 commercial and residential rental properties in Mercer County. Petitioners did not offer any evidence to corroborate DiDonato's testimony, and we decline to accept it given the fact that the 2003 and 2004 returns reported the extent of his rental real estate activities as pertaining to only nine rental properties.  As far as the record is concerned, DiDonato appears to be a successful optometrist who has limited experience in the rental real estate market by virtue of his leasing rental properties to entities he owned and operated.  We question DiDonato's claim to have had success in his rental real estate activities given that the only reliable history in that respect concerns his renting each of nine rental properties to ASC, his father, or Mr. Richen (or another individual).  This factor is neutral at best.

**[\*109]**              f.       Petitioners' History of Income and Loss

We next examine petitioners' history of income and loss with respect to the rental real estate activity.  A series of substantial losses may indicate the taxpayer did not conduct the activity for profit.  Golanty v. Commissioner, 72 T.C. 411, 427 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b)(6), Income Tax Regs.  Losses during the initial stage of an activity do not necessarily indicate, however, that the activity was not conducted for profit.  Engdahl v. Commissioner, 72 T.C. 659, 669 (1980); sec. 1.183-2(b)(6), Income Tax Regs.

Petitioners reported sizable losses with respect to the 245 Cold Soil property for each of the subject years.  They offered no evidence that the rental activity for the 245 Cold Soil property became profitable in later years or that they sold the property for a gain.  At the same time, DiDonato rebuffed inquiries from real estate developers about the sale of the 245 Cold Soil property.  This factor weighs against the finding of a profit objective.

                g.       The Amount of Occasional Profits

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of the assets in use may indicate a profit objective.  Sec. 1.183-2(b)(7), Income Tax Regs.  The opportunity to earn

**[*110]** substantial profits in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit even though only losses are produced.  Id.  In determining whether the taxpayers entered into the activity for profit, a small chance of making a large profit may indicate the requisite profit objective.  Id.

Petitioners presented no evidence that their investment in the 245 Cold Soil property might create a windfall profit to them apart from tax savings.  Although real estate developers may have sought out the 245 Cold Soil property, among others, DiDonato was then unwilling to discuss the sale of that property.  The record does not include evidence to suggest petitioners might earn a profit from the sale of the 245 Cold Soil property.  In the absence of such information, we conclude it does not exist or it would not be favorable to petitioners' position.  Accord Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165 ("The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable.").  This factor does not favor a finding of a profit objective.

- 111 -

**[*111]**          h.          Petitioners' Financial Status

The fact that taxpayers do not have considerable income from sources other than the activity may indicate the activity is engaged in for profit.  See sec. 1.183-2(b)(8), Income Tax Regs.  Substantial income from other sources may indicate a lack of a profit objective, however, particularly if there are personal or recreational elements in the activity.  Id.

Petitioners reported sizable total income for each of the subject years; they reported receiving $237,196 for 2003 and $222,279 for 2004.  Because petitioners aggregated their rental income and expenses on Schedules E, they were able to claim losses from their activity at the 245 Cold Soil property to offset rental income that they (or Mallard) received from ASC for the commercial rental properties.  Indeed, the losses from the 245 and 265 Cold Soil properties, net of depreciation, would have enabled petitioners to offset all rental income they (or Mallard) received from ASC.  The considerable tax savings petitioners claimed from structuring their investment in the 245 Cold Soil property to offset gains from other rental real estate activities undercuts the claim that petitioners engaged  in the activity with an intent to profit without regard for tax savings.[40]  See Seaman v.

_____

[40]Petitioners' farming activity, as it related to the personal residence and the 245 and 265 Cold Soil properties, also enabled them to reduce their local property

(continued...)

[*112] Commissioner, 84 T.C. at 588; see, e.g., Smith v. Commissioner, T.C. Memo. 2007-154, 93 T.C.M. (CCH) 1371, 1376 (2007) (using losses to offset income weighs in favor of finding the taxpayer was not engaged in an activity for profit); Kahla v. Commissioner, T.C. Memo. 2000-127, 79 T.C.M. (CCH) 1846, 1852 (2000), aff'd without published opinion, 273 F.3d 1096 (5th Cir. 2001).  This factor weighs against the finding of a profit objective.

i.      Elements of Personal Pleasure

The existence of elements of personal pleasure or recreation relating to the activity may indicate the absence of a profit objective.  Sec. 1 .183-2(b)(9), Income Tax Regs.  An activity will not be treated as not engaged in for profit simply because the taxpayers have purposes or motivations other than making a  profit.  Id.  The record does not suggest that petitioners derived any satisfaction from the rental

---

[40](...continued)
taxes by hundreds of thousands of dollars.  On this point DiDonato testified that his failure to secure farm and agricultural designation of these properties for assessment purposes would result in the "county government * * * confiscating his property." He went on to explain that "two-hundred [sic] fifty acres assessed at market value, I'd have a tax bill of $750,000 a year plus rollback taxes.  You can't do it.  Nobody in New Jersey has acreage more than five acres without getting a farm assessment. To get a farm assessment, you have to sell agricultural products.  Everybody in New Jersey sells agricultural products."  We reject the suggestion that manipulating local property tax law creates an actual and honest profit objective for Federal income tax purposes.

**[\*113]** of the 245 Cold Soil property apart from the Federal income tax and local property tax savings they expected to realize therefrom.  We view this factor as neutral.

j.        Summary

On balance, one factor weighs in favor of a profit objective, one factor is neutral, and eight weigh against a finding of a profit objective.  We conclude petitioners's rental real estate activity with respect to the 245 Cold Soil property was not entered into with an actual or honest objective of making a profit.  Thus, petitioners may not deduct expenses for the 245 Cold Soil property under section 162(a) or 212.  Petitioners are, however, entitled to deductions under section 183(b) with respect to the 245 Cold Soil property as follows.  First, petitioners are allowed deductions for expenses that are deductible without regard to whether the rental real estate activity was engaged in for profit; specifically, real estate taxes of $5,590 for 2003 and $5,853 for 2004.  See secs. 164(a)(1), 183(b)(1); Brannen v. Commissioner, 78 T.C. 471, 499-500 (1982), aff'd, 722 F.2d 695 (11th Cir. 1984).  Second, petitioners are allowed deductions for expenses that would be deductible if the rental real estate activity was engaged in for profit, but only to the extent of gross receipts from the activity; namely $9,600 for each of the subject years.  See sec. 183(b)(2).  Because the 245 Cold Soil property was not a qualified residence

**[\*114]** of petitioners under section 163(h)(4)(A)(i), they are not entitled to mortgage interest deductions over and above that already allowed under section 183(b)(2). See Epstein v. Commissioner, 67 T.C.M. (CCH) at 2049 n.4.

VII.   Equipment Leasing's Losses and Recapture of Excess Depreciation

A.      Overview

Petitioners claimed loss deductions that flowed through from Equipment Leasing's aircraft leasing activity of $694 for 2003 and $19,964 for 2004. Petitioners took the reporting position on their 1999 through 2003 returns that the aircraft was predominantly used in a qualified business use. Consistent with that position, petitioners claimed accelerated depreciation expense deductions totaling $278,950 on Schedules C attached to the 1999 through 2002 returns. Petitioners also took the position that the aircraft was predominantly used in a qualified business use during 2003. Consistent therewith, they claimed accelerated depreciation expense deductions of $43,200 and $21,600 on Equipment Leasing's Schedules C attached to their 2003 and 2004 returns, respectively. On brief, petitioners assert that they are entitled to an accelerated depreciation expense deduction for each of the years 1999 through 2004 because the aircraft share was used in a qualified business use more than 50% of the time.

[*115] Respondent challenges petitioners' entitlement to loss deductions from Equipment Leasing's aircraft leasing activity for 2003 and 2004, and he alleges through an amended answer that petitioners must recapture in 2003 excess depreciation claimed for 1999 through 2002. We agree with respondent on both points.

B.      Burden of Proof

Petitioners generally bear the burden of proving their entitlement to the aircraft leasing activity loss deductions claimed for 2003 and 2004. See Rule 142(a). Respondent concedes on brief that he must prove that petitioners must recapture for 2003 excess depreciation claimed for 1999 through 2002. See id.

C.      Loss Deductions Claimed for 2003 and 2004

Respondent disallowed loss deductions of $694 for 2003 and $19,964 for 2004 with respect to Equipment Leasing's aircraft leasing activity. Respondent concedes on brief that petitioners are entitled to claim items of income and expense as reported on the Schedules C for Equipment Leasing attached to the 2003 and 2004 returns, but respondent maintains that petitioners must depreciate the aircraft using the alternative depreciation system of section 168(g) and recapture in 2003 excess depreciation claimed on their 1999 through 2002 Federal income tax returns. On the basis of respondent's concession, Equipment Leasing's net profit

**[*116]** or loss for the subject years shall be calculated as reported on the 2003 and 2004 returns, except as modified immediately below.

D.      Recapture of Excess Depreciation

Respondent alleges in his amended answer that petitioners did not use the aircraft share in a qualified business use during 2003 for two reasons. First, he asserts that the aircraft share was not predominantly used in a qualified business use under section 280F because Equipment Leasing and ASC were related parties. See sec. 280F(d)(6)(C)(i). Second, he contends that less than 25% of the total use of the aircraft share consisted of a qualified business use that was not between related parties. See id. Respondent argues that because the aircraft share was not used in a qualified business use during 2003, petitioners are not entitled to claim an accelerated depreciation expense deduction for 2003 but must use the straight-line depreciation method. See secs. 168(g)(1), 280F(b)(1). Respondent further contends that petitioners must recapture for 2003 the excess depreciation claimed for 1999 through 2002. See sec. 280F(b)(2). Petitioners maintain that they used the aircraft share for a qualified business use more than 50% of the time. We agree with respondent.

Depreciation deductions are principally governed by sections 167 and 168. Section 167(a) allows as a depreciation deduction a reasonable allowance for the

[*117] exhaustion, wear, and tear (including a reasonable allowance for obsolescence) of property used in a trade or business or held for the production of income. Section 168(a) specifies that the amount allowed as a depreciation deduction under section 167(a) is determined by using the applicable depreciation method, the applicable recovery period, and the applicable convention. As relevant to the aircraft share at issue here, the applicable depreciation method is generally the 200% declining balance method, switching to the straight line method for the first taxable year in which the straight line method yields a larger allowance than the 200% double declining balance method. Sec. 168(b)(1).

Section 280F may limit the allowable depreciation deduction where listed property, including property used for transportation, is not predominantly used in a qualified business use. See sec. 280F(b)(1), (d)(4)(A)(ii); sec. 1.280F-6(b), Income Tax Regs. (recognizing airplanes as transportation). As a general rule, where any listed property is not predominantly used in a qualified business use for the taxable year, the general depreciation method of section 168(b)(1) (i.e., double declining switching to straight line, is not used). See sec. 280F(b)(1). Rather, the alternative depreciation system of section 168(g) (i.e., the straight-line method) is used to compute the allowable depreciation deduction. See secs. 280F(b)(1), 168(g)(1) and (2). Moreover, where the qualified business use of any listed property falls to 50%

**[\*118]** or less, the taxpayer is required to include in gross income (recapture) for the taxable year in which the property is first not predominantly used in a qualified business use.  See sec. 280F(b)(2)(A).  The term "excess depreciation" means the excess, if any, of (1) the amount of depreciation deductions allowed when the property was predominantly used in a qualified business use, over (2) the amount of depreciation deductions allowed when the property was not predominantly used in a qualified business use.  Sec. 280F(b)(2)(B).

Property is treated as predominantly used in a qualified business use if the business use for the year exceeds 50%.  Sec. 280F(b)(3).  The term "qualified business use" generally means any use in the taxpayer's trade or business.  Sec. 280F(d)(6)(B).  Qualified business use does not, however, include leasing property to a 5% owner or a related person.  Sec. 280F(d)(6)(C)(i).  Where an aircraft is at issue, however, qualified business use still includes leasing property to any 5% owner or related person so long as at least 25% of the total use of the aircraft during the year consists of qualified business use that is not excluded under section 280F(d)(6)(C)(ii).  See sec. 1.280F-6(d)(2)(ii), Income Tax Regs.  A 5% owner not a corporation is any person who owns more than 5% of the capital or profits interest in the entity.  See secs. 280F(d)(6)(D)(i), 416(i)(1)(B)(i).  Related persons include, among other relationships, an individual and a corporation where the

[*119] individual controls more than 50% of the value of the corporation's stock. See secs. 280F(d)(6)(D)(ii), 267(b)(2). The aircraft share was owned by Equipment Leasing, an LLC of which DiDonato is the only member. Equipment Leasing leased the aircraft to ASC, an S corporation that is wholly owned by DiDonato. Thus, we conclude that Equipment Leasing and ASC are related persons as two corporations which are members of the same controlled group under section 267(b)(3) and are therefore related for purposes of section 280F(d)(6)(D)(ii) and (c)(i)(I).

As set out by Tech. Adv. Mem. 200945037 (July 29, 2009), whether a taxpayer has used the aircraft for a qualified business use more than 50% of the time is generally a two-step analysis. The failure to satisfy both steps requires a finding that the aircraft was not predominantly used in a qualified business and therefore that the allowable depreciation deduction under section 168 is determined under the alternative depreciation system of section 168(g). See sec. 280F(b)(1). Under step 1, we determine whether the qualified business use of the aircraft satisfies the 25% threshold under section 280F(d)(6)(C)(ii), exclusive of uses listed under section 280F(d)(6)(C)(i). If the 25% threshold is met, the business uses excluded under section 280F(d)(6)(C)(i) may be taken into account as qualified business use to determine whether more than 50% of the total use of the

**[*120]** aircraft is qualified business use for purposes of section 280F(b)(1). If the 25% threshold under section 280F(d)(6)(ii) is met with regard to section 280F(d)(6)(C)(i), we proceed to step 2.

Under step 2, business use excluded under section 280F(d)(6)(C)(i) may be taken into account as qualified business use to determine whether more than 50% of the total use of the aircraft is qualified business use for purposes of section 280F(b)(1). To the extent the taxpayer's qualified business use of the aircraft exceeds 50%, section 280F(b)(1) is satisfied, and the taxpayer may be entitled to deduct depreciation under section 168(a), additional first-year deprecation (bonus depreciation) under section 168(k)(1), and any deduction allowable under section 179. See also sec. 280F(b)(1), (d)(1), (6). To the extent the taxpayer's qualified business use of the aircraft is 50% or less, section 280F(b)(1) is not satisfied, and the taxpayer must use the general depreciation method of section 168(b)(1) (i.e., double declining switching to straight line). See sec. 280F(b)(1). Moreover, as explained above, where the qualified business use of any listed property falls to 50% or less, the taxpayer is required to include in gross income (recapture) for the taxable year in which the property is first not predominantly used in a qualified business use. See sec. 280F(b)(2)(A).

**[\*121]** Applying the foregoing test in the instant case, we conclude that petitioners are not entitled to accelerated and bonus depreciation and that they must recapture in 2003 excess depreciation claimed for 1999 through 2002. The aircraft was listed property under section 280F(d)(4) because it was used for transportation. See sec. 280F(d)(4)(A)(ii); sec. 1.280F-6(b), Income Tax Regs. Under step 1 of the analysis we examine whether the use of the aircraft meets the 25% threshold of section 280F(d)(6)(C)(ii). We conclude petitioners fail this step. All leasing of the aircraft by Equipment Leasing during the subject years was to ASC, a related party under sections 167(b)(3) and 280F(d)(6)(D)(ii) and (C)(i)(I). Also during the subject years, Equipment Leasing did not lease the aircraft to an unrelated party. Therefore, for each of the subject years, zero percent of the leasing was to an unrelated person and Equipment Leasing fails the 25% threshold required under section 280F(d)(6)(C)(ii). Because the 25% threshold of section 280F(d)(6)(C)(ii) is not met for either of the subject years, petitioners are not entitled under section 168 to accelerated depreciation, see sec. 280F(b)(1), and are required for 2003 to recapture excess depreciation claimed for 1999 through 2002, see sec. 280F(b)(2). The amounts of the depreciation expense deductions for 2003 and 2004 and the amount of excess depreciation required to be recaptured in 2003, as well as their

**[\*122]** effect on petitioners' deficiencies for the subject years, shall be determined in the parties' Rule 155 computations.

## VIII.  Accuracy-Related Penalties

### A.  Overview

Section 6662(a) and (b)(1), (2), and (3) provides that taxpayers are liable for a 20% accuracy-related penalty on the portion of any underpayment of income tax attributable to, among other things, negligence or disregard of rules or regulations, substantial understatements of income tax, or substantial valuation misstatements. Only one accuracy-related penalty may be applied with respect to any portion of an underpayment of tax, even if that portion resulted from more than one of the types of misconduct described in section 6662.  Sec. 1.6662-2, Income Tax Regs. An accuracy-related penalty under section 6662 does not apply to any portion of an underpayment of tax for which the taxpayer had (1) reasonable cause and acted in good faith, see sec. 6664(c)(1), (2) substantial authority for the treatment of the items at issue, see sec. 6662(d)(2)(B)(i), or (3) adequately disclosed in the return the relevant facts affecting the item's tax treatment and a reasonable basis for the claimed treatment, see sec. 6662(d)(2)(B)(ii).

Respondent determined petitioners are liable for the accuracy-related penalty for a substantial understatement of income tax for each year at issue.  See sec.

[*123] 6662(a), (b)(2). Petitioners do not deny that the accuracy-related penalties apply in accordance with their terms. Rather, petitioners argue they are not liable for the accuracy-related penalties because, as they see it, there was substantial authority for their positions, they disclosed the items at issue on the 2003 and 2004 returns, and they qualify for the reasonable cause defense of section 6664(c) by relying in on the advice of their tax professional. We will sustain respondent's imposition of the accuracy-related penalties.

B.      Burden of Proof

Respondent bears the burden of production with respect to the imposition of the accuracy-related penalties in that he must produce sufficient evidence that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent has satisfied his burden of production by showing the understatement for each of the subject years exceeds the greater of 10% of the tax required to be shown on the return and $5,000. See sec. 6662(d)(1)(A). Thus, the burden of proof is upon petitioners to show they are not liable for the penalties because of reasonable cause, substantial authority, or adequate disclosure grounded in a reasonable basis.

[*124] C.  Substantial Authority

Petitioners argue that the accuracy-related penalties may not be imposed as to the disallowed deductions because, as they see it, there was substantial authority for the deductions claimed.  We disagree.

Where taxpayers have substantial authority for the tax treatment of any item reported on a Federal tax return, the tax attributable to those items is not included in deciding whether there was an understatement of tax.  See sec. 1.6662-4(d)(1), Income Tax Regs.  Substantial authority for the treatment of an item exists only if the weight of the authorities supporting the treatment of the item is substantial in relation to the weight of authorities supporting contrary treatment.  Sec. 1.6662-4(d)(3), Income Tax Regs.  The weight of the authorities is determined in the light of all relevant facts and circumstances.  Id.  The substantial authority standard is an objective standard involving an analysis of the law and application of the law to the relevant facts.  Sec. 1.6662-4(d)(2), Income Tax Regs.

Petitioners maintain that there was substantial authority for the charitable contribution deduction claimed on the 2004 return and disallowed in our prior opinion in this case.  We disagree.   At the outset, petitioners appear to confuse the grounds on which the charitable contribution deduction was disallowed. Petitioners assert that there was substantial authority for the position that the

[*125] appraisal attached to the 2004 return was a qualified appraisal pursuant to section 1.170A-13(c)(3), Income Tax Regs. However, as explained in DiDonato v. Commissioner, 101 T.C.M. (CCH) at 1742-1743, petitioners were denied a charitable contribution deduction because they failed to secure a contemporaneous written acknowledgment. In this regard, we held it was not possible for petitioners to secure such an acknowledgment in 2004 because DiDonato's obligation to transfer the development rights remained conditional until at least December 2005. Id. at 1743. Moreover, we expressed concern that the appraisal was not qualified, see id. at 1741 n.8, but noted that respondent did not allege any defect in the appraisal, see id. And contrary to petitioners' contention, the requirement of section 170(f)(8) to obtain a contemporaneous written acknowledgment is not a mere formality. Because petitioners have not pointed us to any authority allowing a charitable contribution deduction for a conditional gift or for one which lacked a contemporaneous written acknowledgment, we decline to conclude there was any such authority when they filed the 2004 return.

We are not persuaded there was substantial authority for any of the disputed positions taken on the 2003 and 2004 returns. Contrary to petitioners' claim, the weight of the authorities establishes petitioners were not entitled to the deductions claimed. Nor was there substantial authority for petitioners' position that they

[*126] could claim loss deductions for rental real estate activity where the dwelling unit was rented to a member of the taxpayer's family as in the case of the 265 Cold Soil property, or that was not engaged in for profit, as in the case of the 245 Cold Soil property. With respect to the accelerated depreciation recapture, we have concluded that zero percent of the leasing of the aircraft was to an unrelated person and that Equipment Leasing did not meet the 25% threshold required by section 280F(d)(6)(C)(ii), see supra p. 121; petitioners have not cited substantial authority supporting the contrary. As to the remaining disputed deductions, petitioners have not cited any authority, much less substantial authority, for the deductibility of items that were inherently personal and not adequately substantiated.

D.    Disclosure and Reasonable Basis

Petitioners assert that the accuracy-related penalties may not be imposed as to the charitable contribution deduction disallowed in DiDonato v. Commissioner, T.C. Memo. 2011-153, because, they believe, they fully disclosed the facts regarding the claimed contribution on the 2004 return. We disagree.

Petitioners' assertion that they adequately disclosed the facts relating to the charitable contribution deduction is not supported by the record. As we explained in DiDonato v. Commissioner, 101 T.C.M. (CCH) at 1742-1743, petitioners failed to disclose that the contribution of the development rights was conditional until at

**[\*127]** least December 2005, and indeed, our own analysis required that we research New Jersey law to understand the process for when a contribution becomes final. Any claim that petitioners adequately disclosed the particulars of the transfer is simply not supported by the record. Thus, we reject petitioners' claim that they adequately disclosed the facts relevant to the charitable contribution deduction. Even if the disclosure were adequate, petitioners could not avail themselves of the defense under section 6662(d)(2)(B)(ii) because they have failed to provide authority that could provide a reasonable basis for their return position. See sec. 1.6662-4(e)(2)(i), Income Tax Regs.; see also sec. 1.6662-3(b)(3), Income Tax Regs. ("Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim.").

E.      Reasonable Cause

Finally, petitioners maintain that they are not liable for the accuracy-related penalties because they satisfy the reasonable cause defense of section 6664(c)(1). As petitioners see it, DiDonato's longstanding relationship with Amper and his lack of formal education in accounting and tax matters entitles them to find a safe harbor under the reasonable cause defense.

[*128] Under section 6664(c)(1), the section 6662(a) accuracy-related penalty does not apply to any portion of an underpayment for which the taxpayers establish that they: (1) had reasonable cause and (2) acted in good faith. The taxpayers' reliance on the advice of a professional, such as an accountant, may constitute reasonable cause and good faith where the taxpayers prove by a preponderance of the evidence that: (1) the taxpayers reasonably believed that the professional upon whom the reliance is placed is a competent tax adviser with sufficient expertise to justify reliance; (2) the taxpayers provided necessary and accurate information to the adviser; and (3) the taxpayers actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also sec. 1.6664-4(c)(1), Income Tax Regs. On the basis of the record as a whole, we conclude petitioners have not satisfied the second or third requirement.

The record establishes that DiDonato did not actually rely on the advice he received from Amper. The aircraft letter was clear that any personal use of the aircraft would require that gross income be imputed to DiDonato. Petitioners did not charge themselves gross income for the personal use of the aircraft by themselves and their children. Moreover, the aircraft letter was procured from Amper in 1999, but as far as the record is concerned, was never updated as to the

[*129] relevant status of the law. We do not agree that it was reasonable under these facts for petitioners to rely upon the opinion of an accounting firm almost five years after the fact without receiving an update as to possible changes in the law and of their use of the aircraft.

Nor does the record establish that petitioners provided to their accountants necessary and accurate information concerning the deductions claimed. In this regard, Mr. Dougherty testified that Amper did not have in its possession the flight logs relating to the plane and that the determination that the aircraft was used for a qualified business use for depreciation purposes was made on the basis of conversations with DiDonato. On the basis of those conversations, Mr. Dougherty understood that DiDonato did not use the aircraft for personal purposes during the subject years which, as the record establishes, was untrue. Mr. Dougherty also testified that had he known that petitioners' children were on board during the flights purportedly flown for business purposes, Amper would not have advised DiDonato to claim that the cost of the flights were deductible business expenses. Thus, in addition to the lack of actual reliance on their accountant's opinion, petitioners did not provide accurate information on which the accountants could formulate an opinion which might properly have been relied upon.

**[\*130]** As to the real estate opinion, we conclude that the opinion was not sufficient for reliance to be placed on it. The real estate opinion contained numerous factual errors. The real estate opinion concluded that DiDonato "will * * * be able to depreciate the building and take all the related expenses." The real estate opinion never addresses which "building" is depreciable or which expenses are deductible. The real estate opinion concluded, without supporting facts or legal analysis, that a discount sale or an outright donation of development rights "will" yield a charitable contribution deduction on DiDonato's individual return. The real estate opinion does not discuss the value of the transferred development rights, whether the donee was a qualifying organization, or any other facts which would substantially guarantee deductibility under section 170(a). Accordingly, we conclude that petitioners did not rely on the advice of Amper. It follows that petitioners are liable for accuracy-related penalties to the extent stated herein.

The Court has considered all arguments for a contrary result and, to the extent not discussed herein, we conclude those arguments are irrelevant, moot, or without merit.

[*131] To reflect the parties' concessions and to give effect to the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.